717 A.2d 406

IN THE MATTER OF STEVEN H. GIFIS,
AN ATTORNEY AT LAW.

Decided September 24, 1998.

## ORDER

The Disciplinary Review Board having filed with the Court a report recommending that **STEVEN H. GIFIS** of **PENNINGTON**, who was admitted to the bar of this State in 1970, be disbarred for the knowing misappropriation of escrow funds in three matters, in violation of *In re Hollendonner*, 102 *N.J.* 21, 504 *A.*2d 1174 (1985); for acting with a conflict of interest, in violation of *RPC* 1.8(a); for making misrepresentations to a tribunal, in violation of *RPC* 3.3(a)(5) and *RPC* 8.4(c); and for numerous violations of the attorney recordkeeping provisions of *Rule* 1:21–6;

And said **STEVEN H. GIFIS** having been ordered to show cause why he should not be disbarred or otherwise disciplined;

And good cause appearing;

It is ORDERED that the report and recommendation of the Disciplinary Review Board are hereby adopted and that **STEVEN H. GIFIS** be disbarred, effective immediately, and that his name be stricken from the roll of attorneys of this State; and it is further

ORDERED that **STEVEN H. GIFIS** comply with *Rule* 1:20-20 dealing with disbarred attorneys; and it is further

ORDERED that all funds, if any, currently existing in any New Jersey financial institution maintained by **STEVEN H. GIFIS** pursuant to *Rule* 1:21-6, be restrained from disbursement except on application to this Court, for good cause shown, and shall be transferred by the financial institution to the Clerk of the Superior Court, who is directed to deposit the funds in the Superior Court Trust Fund, pending further Order of this Court; and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that **STEVEN H. GIFIS** be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.

## APPENDIX

### SUPREME COURT OF NEW JERSEY
Disciplinary Review Board
Docket No. DRB 97-070

**IN THE MATTER OF
STEVEN H. GIFIS
AN ATTORNEY AT LAW**

**Decision**

Argued: September 18, 1997

Decided: June 10, 1998

Michael J. Sweeney appeared on behalf of the office of Attorney Ethics.

Lawrence S. Lustberg and Louis Raveson appeared on behalf of respondent.

To the Honorable Chief Justice and Associate Justices of the Supreme Court of New Jersey.

This matter was before the Board based on a recommendation for disbarment filed by Special Master David H. Dugan III. The five-count complaint charged respondent with knowing misappropriation of escrow funds in three instances (counts one, two and three), conflict of interest and false statement to a tribunal (count four) and recordkeeping violations (count five).

Respondent was admitted to the New Jersey bar in 1970. He is a sole practitioner in Pennington, Mercer County, New Jersey. From 1970 through 1983 respondent was a professor at Rutgers Law School–Newark, where he taught courses in federal jurisdiction, contracts, criminal law and criminal procedure. In 1983 he left the law school to become legal counsel to several corporations in the Princeton area. In 1990 he established his own law practice in Pennington. Astonishingly, since respondent opened a trust account in 1970 and until the investigation of these matters, he did not take the time to acquaint himself with the rules governing attorney trust accounting, the *Rules of Professional Conduct* or attorney ethics caselaw. The unfortunate picture that emerges from these proceedings is that of an attorney who took great liberties with funds that should have remained in escrow and who failed to recognize the impropriety of intertwining his business enterprises with those of his clients.

Before these grievances, respondent had no disciplinary history. There follows a factual recitation of respondent's grave improprieties in each matter cited in the complaint.

## I. *THE BOYD-HOFER MATTER* (COUNT ONE)

This count of the complaint alleges that respondent knowingly misappropriated escrow funds when he used for his own purposes a $51,000 deposit made by Andrew and Margaret Hofer, the buyers of real estate owned by John and Laura Boyd, respondent's clients.

Respondent and John Boyd have a professional relationship of longstanding. Since 1991, respondent has represented Boyd in personal as well as business matters. John Boyd is the owner of Iceland, a skating rink in Hamilton Township, Mercer County, New Jersey. Respondent regards Boyd as one of his principal clients, as well as a friend. In the course of their relationship, respondent and Boyd have also engaged in business transactions with each other. In addition, respondent has arranged for transactions between Boyd and other clients of respondent.

On April 16, 1994 the Boyds and the Hofers signed a contract for the sale of a house located at 7 Castle Howard Court, Princeton Township, New Jersey. The agreement of sale was prepared by the Hofers' attorney. Respondent was familiar with the contract form, however, and even had it on his computer software.

The agreement called for a $510,000 purchase price and a $51,000 deposit, to be held in escrow by respondent until closing of title. Closing was expected to take place some six weeks later, May 31, 1994. Paragraph 1 of the agreement listed several contingency provisions, as follows:

Termite inspection: 14 days
Building inspection: 14 days
Radon inspection: 21 days
Mortgage: 30 days
Mortgage amount: $300,000

Mortgage term: 30 years

According to respondent, although the contract contained a mortgage contingency clause, Merrill Lynch, where Mr. Hofer held an executive position, had already pre-approved a mortgage loan for the Hofers. Therefore, in respondent's view, this was a "cash transaction."

Other contract provisions pertinent to the deposit were as follows:

PURCHASE PRICE 5. The escrow deposit shall be made by personal check on the signing of this Agreement. *This sum shall be held in escrow as stated in Paragraph 1 until closing. In the event of the mutually agreeable termination of this Agreement the escrow deposit shall be returned to Buyer with interest, if any, provided Buyer is not in default* \*\*\*.

\*    \*    \*    \*    \*    \*    \*    \*

TITLE DEFECTS 11. A. If Seller cannot convey title in accordance with this Agreement, Seller shall have thirty (30) days from the date of receipt of a written notification to remove any such title defects. If the defects have not been removed within the thirty (30) days, or by the closing date, whichever is later, then, unless the parties agree in writing to some other period of time, *Seller's sole obligation shall be to refund Buyer's down payment (or to direct the escrow agent to do so )* and to reimburse Buyer for actual cancellation costs of title examination and survey, and counsel fees. These costs shall be a lien against the property in favor of Buyer until paid. Upon making the refund and reimbursement, this Agreement shall terminate and neither Buyer nor Seller shall have any further claim against the other.

\*    \*    \*    \*    \*    \*    \*    \*

FIRE AND CASUALTY 13. A. Until delivery and acceptance of the deed, the risk of loss or damage to any part of the property by fire or other casualty shall be borne by Seller.

B. If the buildings on the property are damaged by fire or other casualty to the extent of $10,000 or more before the delivery of the deed, Seller shall notify Buyer in writing, Buyer shall have the option to cancel this Agreement. Such option must be exercised in writing within ten (10) days after receiving written notice from Seller that the monetary extent of such loss or damage equaled or exceeded $10,000. *If Buyer elects to cancel this Agreement, Seller shall refund the deposit (or direct the escrow agent to do so,* with interest if the funds were held in an interest-bearing account) and this Agreement shall terminate.

\*    \*    \*    \*    \*    \*    \*    \*

ESCROW AGENT 25. Seller and Buyer agree that any escrow agent serving under this Agreement shall incur no liability except for the escrow agent's own willful misconduct. The escrow agent

is not responsible for the collection of the proceeds of the deposit check but shall take reasonable, prompt steps to attempt collection. Seller and Buyer jointly and severally indemnify and hold such escrow agent harmless against and from any claim, loss, liability, cost or expense, including reasonable attorneys' fees, resulting from any dispute or litigation concerning the escrow agent's duties or services under this Agreement. *The escrow deposit shall be held and disbursed in accordance with Paragraph 1 and the other terms of this Agreement. If either party refuses to permit a proposed distribution of the escrow deposit, the escrow agent shall continue to hold the escrow deposit and thereafter may pay it to the party or parties entitled to it only upon receipt of either (a) a notice from the objecting party permitting distribution, (b) notices signed by Seller and Buyer directing disposition of the escrow deposit, or (c) a judgment or order of a court of competent jurisdiction.* Upon payment of the Deposit as provided in this Agreement, the escrow agent shall be released from all liability with respect to the escrow deposit. Nothing herein shall be deemed to preclude the escrow agent from acting as legal counsel for Buyer or Seller, as the case may be. [Emphasis added].

### [Exhibit P–2]

Consistent with the terms of the contract, on April 18, 1994 respondent deposited in his trust account a $51,000 check representing the deposit paid by the Hofers. On that same day respondent used for his own purposes $30,000 of the $51,000 deposit by issuing a $10,000 trust account check payable to himself and a $20,000 trust account check payable to Pennytown Enterprises, Inc. ("Pennytown"), a business venture in which respondent had a twenty percent interest. The memo portions of the two checks read "Boyd–Adv Fees" and "LN Due May 31, 1994," respectively. Ten days later, on April 28, 1994, respondent used the balance of the $51,000 deposit by wire-transferring $21,030 from his trust account to EPV, a company in which he held a seven percent interest.

Respondent claimed that he had John Boyd's authorization to borrow the escrow funds. He conceded, however, that he had not asked the Hofers' or their attorney's permission to use the deposit. According to respondent, he did not try to obtain their consent because he believed at the time that the deposit belonged solely to the Boyds.[1]

Before the closing respondent returned the $51,000 amount to his trust account. Closing of title took place on May 18, 1994. Every dollar from the closing proceeds was used to pay off a $387,000 first mortgage and a $90,000 second mortgage on the property, both held by United Jersey Bank Central, in addition to $33,000 in closing costs.

As mentioned earlier, neither the Hofers nor their attorney had any knowledge that respondent had spent the $51,000 deposit for his own benefit. Respondent admitted at the ethics hearing that he was wrong in not obtaining the Hofers' approval to his use of the $51,000. Respondent testified that he did not do so because he believed at the time that the deposit was non-refundable and, therefore, the exclusive property of the Boyds. The alleged basis for respondent's belief was that the character of the transaction was a cash sale because of the Hofers' waiver of the mortgage contingency clause. Respondent acknowledged, however, that, if other contract contingencies were not satisfied—such as, for example, a satisfactory building inspection report—the Hofers could cancel the agreement and demand the return of their deposit.

John Boyd confirmed at the ethics hearing that he had given respondent permission to use the deposit as a loan. Boyd claimed

---

[1] Laura Boyd also signed the contract as seller and, according to John's testimony, was the "keeper of our financial issues." Although there is a reference in the record that Boyd told respondent that he would confer with his wife, there is nothing indicating that she consented to the use of the funds or that Boyd had legal authority to act in his wife's behalf.

an understanding that the sale was non-contingent and that he was the only person who could "pull the plug." Boyd's testimony on the issue of consent, however, differed from his prior statement to an OAE investigator at a pre-hearing interview. Initially, Boyd told the OAE that he had no recollection of respondent's request to use the funds for personal purposes. By the time of the ethics however, Boyd had remembered giving respondent's authorization to use the deposit:

> I went over my personal calendar to figure out the datelines. I asked Steve what his recollections were and based on his recollections and my recollections, I spoke to my wife who is the keeper of our financial issues, she handles the checkbook, what her recollections were, and based on that, I pieced together a much clearer picture for today.

[T10/29/1996 199]

Respondent professed no knowledge of *In re Hollendonner,* 102 *N.J.* 21, 504 *A.*2d 1174 (1985), which he allegedly never read. That case established the principle that the unauthorized use of escrow funds is akin to the unauthorized use of client trust funds, warranting disbarment under *In re Wilson,* 81 *N.J.* 451, 409 *A.*2d 1153 (1979). In essence, respondent urged a finding that his use of the escrow funds could not be knowing misappropriation because (1) he was unaware of *Hollendonner* and (2) he had an honest, but mistaken, belief that the funds were the sole property of Boyd, who had allegedly consented to their use. Respondent admitted that, in hindsight, he should have secured the Hofers' authorization to the early release of the deposit and should have offered a second mortgage to guarantee its payment. According to respondent, he had utilized that procedure in other transactions where his clients had used real estate deposits before the closing of title.

## II. *THE MEZEY–DRUCKER MATTER* (COUNT TWO)

Respondent was the attorney for Frederick Mezey, also an attorney, in a lawsuit captioned *Zachariah Drucker and Drucker*

*Construction of USA, Inc. v. Frederick C. Mezey, the Estate of Louis A. Mezey, the Estate of Deborah A. Cohen and/or Mezey, Mezey & Cohen.* Zachariah Drucker was represented by Jeremy Doppelt. The tortuous history of this litigation was marked by personal animosity and distrust, chiefly between Doppelt and Mezey. Both sides acknowledged that the cost of their involvement in the case greatly exceeded the value of the claim.

Respondent's troubles in this matter stemmed from his use of $10,000 paid by Mezey to settle the lawsuit. This was the parties' second settlement; Mezey had defaulted on his obligations under the first settlement, prompting a second round of litigation. However, shortly before the return date on several applications for various forms of relief, including sanctions against respondent, the parties at last reached another settlement.

The terms of this settlement were spelled out in a letter from Doppelt to respondent, dated September 13, 1993. In relevant part, that letter stated as follows:

Dear Mr. Gifis:

This letter will serve to follow up the latest of our many phone conversations over the last few days with respect to the above-captioned matters. *We have agreed to settle* both of the above-captioned matters on the following terms and conditions:

1. Mezey, Mezey & Cohen will make a payment in the amount of $10,000.00 which will be payable to Jeremy Doppelt, P.A. Attorney Trust Account.

2. Mezey, Mezey & Cohen will not levy or take any other action with respect to such funds.

\*     \*     \*     \*     \*     \*     \*     \*

5. Mezey, Mezey & Cohen represents that there are no matters pending in any court in which Mezey, Mezey & Cohen or any of its partners, present or past, has filed an action, suit or other matter against Zacharia Drucker or Drucker Construction of USA, Inc. other than Mezey, Mezey & Cohen vs. Zacharia Drucker which bears Docket No. L–11932–92.

\*     \*     \*     \*     \*     \*     \*     \*

7. Zacharia Drucker and Drucker Construction of USA, Inc. will provide a General Release to Mezey, Mezey & Cohen which will release all claims which they

may have either jointly or severally against Mezey, Mezey & Cohen including but not limited to the proceeds of any matter presently being handled by Mezey, Mezey & Cohen in which either or both of them are plaintiffs or counterclaimants and will agree to assign the proceeds, if any, which may be recovered in such action(s) to Mezey, Mezey & Cohen. (In this regard, neither Zacharia Drucker nor Drucker Construction of USA, Inc. makes any representation that there will be any proceeds.)

8. Zacharia Drucker and Drucker Construction of USA, Inc. will execute a Warrant In Satisfaction of the Judgement obtained in Drucker Construction of USA, Inc. vs. Continental Insurance Company of New Jersey.

    *      *      *      *      *      *      *      *

10. You will obtain the $10,000.00 from Mezey, Mezey & Cohen and will deposit same in your attorney trust account. You will obtain these funds within one week of this date. *Such funds will be held by you in escrow and for no purpose other than holding same until I send you the General Release and Warrant In Satisfaction of Judgement referred to in Paragraphs 7 & 8 after which time you will send the funds to me. After receiving such funds and such funds clearing your attorney trust account, you will advise me in writing.* I will then prepare the General Release and Warrant in Satisfaction of Judgement to be executed by Zacharia Drucker and Drucker Construction of USA, Inc.

    *      *      *      *      *      *      *      *

12. You will send me your attorney trust account check in the amount of $10,000 payable to my attorney trust account upon receipt of the Release and Warrant in Satisfaction of Judgement from me.

13. *In light of the prior proceedings in this matter and at the risk of beating a dead horse, this will confirm that your client has agreed that it will not take any action of any kind whatsoever which will interfere with my receipt of the $10,000 figure and the proceeds of the levy referred to above, and my depositing same into my attorney trust account and disbursing same to my firm.*

You will note that I have placed a signature line for you at the bottom of this letter to confirm that this letter accurately reflects the terms of the *settlement* of the above-referenced matters. Please sign it and fax it back to me prior to 6:00 P.M. tonight so that we will not have to proceed with the Court Ordered Supplemental Proceeding Deposition of your client tomorrow at 11:00 A.M. If I do not receive this letter back signed by you by 6:00 P.M., I will expect to see your client tomorrow as per the terms of Judge Rockoff's Order. [Emphasis added].

### [Exhibit P–11]

The letter makes it obvious that an essential element of the settlement was the assurance that Mezey would not interfere with Doppelt's receipt of the $10,000. Asked at the ethics hearing why he had insisted that the $10,000 be held in escrow, Doppelt replied as follows:

*** I did not want to have to trust Mezey to come up with the $10,000 since he had given me no indication throughout my dealings with him that his word was reliable. I, therefore,—I don't know whether I suggested that I hold the money in trust until settlement documents would be prepared that were acceptable or whether Mr. Gifis suggested that he hold it rather than me. I don't remember which way but it ended up where he would be holding the money in his trust account, and I was very particular in my September letter to make clear that that money was to be held in trust and for no other reason other than to be sent to me. That's how that came about.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

I didn't trust [respondent's] client and that's why I required the funds to be held in a trust account.

### [T10/28/96 116,136]

After reviewing this letter, respondent handwrote three additions on it, "faxed" the letter back to Doppelt at 6:00 P.M. of that same day, September 13, 1993, and signed the bottom of the letter, which had the following provision:

THIS LETTER ACCURATELY REFLECTS THE TERMS OF THE *SETTLEMENT AGREEMENT WHICH WE HAVE ENTERED INTO* WITH RESPECT TO THE ABOVE–REFERENCED MATTERS. [Emphasis added].

### [Exhibit P–11]

At the same time respondent "faxed" a memorandum to Doppelt explaining his handwritten changes to the settlement terms:

Enclosed please find your Settlement Memo, with some *minor modifications* endorsed thereupon and signed by me. I have conferred with Mr. Mezey who suggested the modifications and is otherwise in agreement with the terms set forth.

In case you cannot read my writing let me highlight the changes from your text:

5. add 'to the best of its knowledge'. Fred is without any knowledge of any such suits by his former partners.

7. add 'and will execute Assignment thereof.' Fred wants a specific assignment document.

8. add 'and dismiss Appeal with prejudice.' I assume this was an oversight. Our agreement included a withdrawal by you of your appeal on the Default Judgment. I assume that a *Settlement Agreement* will be drafted by you (since you are the only one now getting paid on this case) *which will incorporate the terms of this Settlement Letter.*

*By copy of this letter I am directing Fred to deliver to me as soon as possible the settlement funds in the amount of $10,000.* [Emphasis added].

**[Exhibit P–12]**

On September 21, 1993, Mezey gave respondent a $10,000 check to fund the settlement. The check was drawn against the business account of Mezey's law firm, Mezey, Mezey & Cohen, also a defendant in the lawsuit. **Exhibit P–18.**

The record is silent about any further communications or discussions concerning the settlement from September 13 through September 23, 1993. During a telephone conversation with Judge Rockoff on September 23, 1993, Doppelt informed the judge about the settlement. At the judge's direction, Doppelt sent him the following letter on September 24, 1993:

> Dear Judge Rockoff:
>
> This letter will serve to follow up my September 23, 1993 phone conversation with you at which time I indicated to you that the parties to the above-referenced matters have *settled all issues* in both matters.
>
> I am enclosing a copy of a letter dated September 13, 1993 which I faxed to Mr. Gifis which sets forth the terms of the parties' agreement. You will note that Mr. Gifis made three handwritten changes in my letter. The change to Paragraph 5 (the addition of 'to the best of its knowledge' would not be included in the more formal settlement agreement since Mr. Mezey has confirmed that no actions were filed by any other members of Mezey, Mezey & Cohen). I have no objection to the other two changes (with respect to Paragraph 7, my client executing the requested assignment and with respect to Paragraph 8, dismissing the appeal with prejudice).
>
> I am in the process of preparing a more formal Settlement Agreement, Assignment, Release, Warrant In Satisfaction of Judgement and other Settlement Documents. I expect to be able to file a Warrant satisfying the Consent Judgement in Drucker Construction of USA, Inc. v. Continental Insurance Company in short order. I am enclosing a copy of a letter which I have sent this day to the clerk of the Appellate Division indicating that I have withdrawn the Appeal which I filed of Your Honor's denial of the motion which I filed to vacate the default judgement in Mezey, Mezey & Cohen v. Zacharia Drucker & Drucker Construction of USA, Inc.\*\*\*. [Emphasis added].

**[Exhibit P–13]**

It is obvious—and Doppelt so testified—that Doppelt believed on September 13, 1993, when he sent a letter to respondent outlining the terms of the settlement, that he and respondent had reached a settlement agreement. Doppelt testified that, relying

on the settlement, he had withdrawn his order to show cause application before Judge Rockoff as well as the appeal from the judge's denial to vacate a default judgment against Drucker.

Respondent testified, however, that he viewed his understanding with Doppelt as an agreement "in principle" to settle for $10,000:

> *** We agreed to settle it in principle before the return date of an Order to Show Cause, but there were, at least in my mind, and at the specific direction of Mr. Mezey, *significant matters* due to be negotiated and resolved***. [Emphasis added].

[T10/29/1996 259–60]

Respondent cited as one example of "significant matters to be negotiated and resolved" an assignment to Mezey of any judgments that might be recovered in litigation that Mezey was still handling for Drucker. Respondent's testimony in this context, however, ran counter to his memorandum to Doppelt acknowledging Mezey's agreement with nearly all of the settlement terms spelled out in Doppelt's letter, save for three "minor modifications."

After receiving a copy of Doppelt's September 24, 1993 letter to Judge Rockoff, respondent did not contact the judge to contradict or clarify any of the contents of the letter. Respondent did nothing to correct Doppelt's or the judge's understanding that there was a final settlement, instead of a settlement "in principle." By this time Mezey had already given respondent a check for $10,000.

On October 8, 1993, two weeks after respondent deposited Mezey's check in his trust account, he used the entire $10,000 for his own purposes. There is a dispute as to whether respondent obtained Mezey's approval to the use of the funds, as seen below. It is uncontested, however, that respondent availed himself of the $10,000 without Doppelt's or Drucker's knowledge or consent.[2]

---

[2] The record is silent on whether respondent obtained the approval of the other defendants in the suit, including Mezey, Mezey & Cohen. As noted above,

According to Doppelt, he never received any communication from respondent indicating that the monies were no longer in escrow. Doppelt testified that, although he did not verify whether the monies had been deposited and had remained untouched in respondent's trust account, he would not have withdrawn his motion before Judge Lockoff if respondent had not made that representation to him.

On November 8, 1993, four weeks after respondent took the $10,000, Doppelt submitted a draft of the settlement documents to respondent. Doppelt's cover letter stated as follows:

> ***I trust that there is no documentation which you will require other than the Warrant In Satisfaction of Judgement and Release to send the $10,000.00 *which you are holding in your attorney trust account.* If my assumption is incorrect, please advise. I recognize that you at one time requested an 'Assignment' of the proceeds of EDPAS matter. Frankly, I believe that the Release should be sufficient since it has such language therein. If you would like a more formal document, please prepare one and I will have my client sign it. [Emphasis added].

### [Exhibit P–14]

After respondent received this letter, he did nothing to correct Doppelt's stated understanding that the funds were being safeguarded in respondent's trust account.

More than one month later, on December 13, 1993, respondent "faxed" a memorandum to Doppelt proposing some changes in the language of the release. Respondent asked Doppelt to obtain Drucker's signature on the documents, if the changes were satisfactory to Doppelt. Respondent then assured Doppelt that, "[u]pon receipt of these documents, properly executed, I will remit the final consideration of $10,000 as per our agreement." **Exhibit R–2.**

Doppelt was unable to deliver the settlement documents soon thereafter. Drucker was in Israel and allegedly could not return to the United States because of an indictment against him. Two

---

the $10,000 check given to respondent was drawn against the business account of Mezey, Mezey & Cohen.

months later, February 28, 1994, Doppelt wrote a letter to respondent enclosing the executed documents and requesting that respondent "forward [his] trust account check in the amount of $10,000.00 ***." A week and a half later, March 11, 1994, respondent sent to Doppelt a $10,000 check from his trust account. Respondent had replenished the account with his own funds. Respondent told the OAE, during a pre-hearing interview, that he had "stalled" Doppelt for about ten days until he had sufficient funds in his trust account to send to Doppelt.

In defense of his use of the $10,000, respondent claimed a belief that Doppelt's consent was not necessary because, in respondent's view, the $10,000 belonged to Mezey alone. As noted earlier, respondent maintained that, on October 8, 1993, when he availed himself of the monies, the *Mezey–Drucker* litigation had a settlement "in principle" only, subject to the delivery of the release, the assignment and other documents mentioned in the settlement negotiations. Respondent contended that the negotiations had continued through December 1993, months after the $10,000 had been received. Respondent argued that, since there was no final settlement at that point, the funds were not technically escrow funds, to be held inviolate for delivery to Doppelt; they were Mezey's funds alone. Respondent denied having affirmatively told Doppelt that he had the $10,000 in his trust account, pointing out that he had intentionally phrased his communications to Doppelt to avoid making that representation. For example, respondent asserted, the only time that he mentioned the $10,000 to Doppelt was in his memorandum to Doppelt of September 13, 1993, which made no representation that the funds were being kept in escrow:

> By copy of this letter I am directing Fred to deliver to me as soon as possible the settlement funds in the amount of $10,000.

### [Exhibit P–12]

Respondent was asked at the ethics hearing why he had not dispelled Doppelt's belief, mentioned in several letters to respondent, that the $10,000 sum was being kept intact in respondent's

trust account. The following exchange took place between the presenter and respondent:

Q. Now, did you ever advise [Doppelt] after [you] received this letter that you were not holding $10,000 in your trust account?

A. No, I did not.

Q. And is there some interpretation of that letter that you made that would not have required that response from you?

A. I had received the $10,000. When the documents were ready and fully negotiated, Mr. Doppelt would have been paid, whether from me or from Fred. So I didn't—I didn't regard that as a problem.

Q. Just as an attorney, did the words in your trust account, did they jump out at you when you got this letter that maybe this is something I'd better—I'd better clear the air, I'd better correct?

A. No, not really.

Q. You didn't deny that you got and you read the letter, though?

A. I didn't deny I got it and I read the letter.

Q. And according to the corrected ledger card that you provided with us—provided to us—by the time that you got this letter, you had already taken the $10,000; is that correct?

A. By November 8, the $10,000 was no longer in the escrow account, that's correct.

Q. So can you recall as you sit here today whether you knew that when you got this letter?

A. As I indicated, whether the $10,000 was in the trust account or in some other account, I knew that I was obliged to fund the settlement of $10,000 when it was ready, or Fred would, depending upon whether I could persuade him to put up a second $10,000.

[T10/29/1996 348–50]

\* \* \* \* \* \* \* \*

Q. Now, you've looked, I am sure, at the course of correspondence between yourself and Mr. Doppelt regarding these issues and in particular regarding the $10,000?

A. Yes.

Q. Do you concede that Mr. Doppelt was reasonable in expecting that those funds were in your trust account that whole time?

A. He probably believed the funds were in my trust account during the period.

[T10/29/1996 354]

In reality, Doppelt was unaware that the $10,000 settlement funds were not in respondent's trust account. Doppelt trusted

that respondent would keep them untouched. Doppelt testified that, "[i]f anyone had asked me for permission not to escrow that money, I would have gone right to Judge Rockoff."

Mezey, too, testified that he did not know that respondent had used the $10,000:

Cross examination by Mr. Walder:

Q. You had no objection, did you to Gifis' use of this $10,000, you just don't recall it; isn't that a fact?

A. I was not aware that he had used it.

Q. My question is, you had no objection if he used it, you just don't recall whether or not you granted him permission; isn't that so?

A. No.

Q. Is it correct that you would not have had any objection but you don't recall?

A. I said I didn't know if I would have had any objection but I didn't recall the subject coming up.

[T10/28/1996 157–58]

Mezey understood that the $10,000 would remain unused in respondent's trust account until the settlement was finalized:

Q. What was your understanding of what was to be done with the $10,000 deposit?

A. Mr. Gifis was to hold it until the settlement was completed.

[T10/28/1996 144] [3]

Respondent recounted a different story. Respondent testified that, before Mezey gave him the $10,000 check, they discussed respondent's request for the temporary use of the funds. The following was respondent's version of the events:

A. I sent Fred a copy of my note to Jeremy [Doppelt] directing him to send me the money within seven days or something, and I called Fred to tell him it was coming, and I said, If you have an extra $10,000, I could use it, trying to get some payment on account.

---

[3] Several portions of the record allude to Mezey's denial, during a pre-hearing interview by the OAE, of consenting to respondent's use of the $10,000. The transcript of that interview, **Exhibit R–16**, was not admitted into evidence. It was marked for identification only.

And he said, I don't even have $10,000.

I said, Well, you better find it somewhere. And I told him that it would take a month or more for the settlement to gel and could I use the money in the interim and then if he found a second $10,000 he could put it in, and if he didn't, I would have to put it back but at least I can solve my own immediate problem that way.

Q. What did he say?

A. He said, I have no problem with that.

Q. And did you do so?

A. Yes. As soon as I got the money I utilized it, I forget exactly what for, but I utilized it at that time.

[T10/29/1996 266].

The record does not reveal the basis for respondent's statement that it would take "a month or more for the settlement to gel." Conceivably, Doppelt could have delivered the documents to respondent, duly executed by Drucker, within a very short time. Indeed, at one point, when respondent complained to Doppelt that the release had not been properly notarized, within one day Doppelt had presented respondent with proper notarization of Drucker's signature, even though Drucker was in Israel.

At the ethics hearing, the special master wanted to know why respondent had asked Mezey for the $10,000 right away if respondent thought that it would take a couple of months for the settlement to be documented. Respondent replied as follows:

Fred had been very delinquent in paying me and yet he was able to come up with his $10,000 in the matter of a day when it was for someone else. That annoyed me. I asked him if I could use it because I really need it and said you can always put up a second $10,000 in a month or two, and if you can't, then I'll put it back, and he agreed to that. It was really an effort on my part to get him to put up a second $10,000. [I] thought it was the last $10,000 I'd probably see in the case.

[T10/29/1996 408].

\*      \*      \*      \*      \*      \*      \*      \*

The presenter from the Office of Attorney Ethics' ("OAE") attempted to show that respondent had deliberately misdated a memorandum from respondent to Mezey about the use of the $10,000. Presumably, the presenter's objective was to assail respondent's credibility, rather than urge a finding that respon-

dent fabricated a document. Indeed, the formal ethics complaint did not charge respondent with such impropriety.

In this context the record discloses the following:

After respondent learned that OAE investigators had interviewed Mezey about this matter, respondent sent to the OAE a letter with enclosures, in an effort to show to the OAE that he had discussed the use of the $10,000 with Mezey before he withdrew the funds. All parties agreed that, although respondent's letter to the OAE was dated August 9, 1994, it should have been dated September 9, 1994. **Exhibit P–28** (first page). That letter states, in relevant part:

> I am also enclosing an invoice and fax memo to Mr. Mezey *both dated April 20, 1994.* You will note that the cover memo [to Mezey] does reference my application of the $10,000 to my fee account***. [Emphasis added].

The cover memo referenced by respondent is the third page of **Exhibit P–28.** In it, respondent reminded Mezey that, in November 1983, Mezey had approved respondent's use of the $10,000 in escrow. That memo reads as follows, in part:

> We have had a standing arrangement for you to give me a retainer of $1,000 on all new matters and for me to bill you at the conclusion of each matter for my actual time at my discounted rate to you of $100/hour. We modified this arrangement when I took on your divorce appeal so that you have been paying me $1,000 per month on account and *you had permitted me to apply the $10,000 'Drucker Settlement' fund to my accruing fees last November*[4] in the hope that you could replace those funds with an additional $10,000 when the settlement documents were finally perfected. You will recall that this finally occurred in late February but you were at that point unable to replace the $10,000 and as agreed I replaced the funds and issued my trustee check to Jeremy to finally end a very troublesome litigation. This has left me with a very large amount still owing and to make matters worse you have discontinued the $1,000 monthly retainer program as of the end of January***. [Emphasis added].

According to the presenter, during Mezey's testimony at the ethics hearing it was revealed for the first time that respondent had misrepresented to the OAE that he had "faxed" the cover memo to Mezey on April 20, 1994. Actually, the communication

---

[4] Respondent used the $10,000 before November 1993 (October 8, 1993).

that respondent had sent to Mezey on. April 20, 1994, was a different memo, which made no mention whatsoever to respondent's use of the $10,000. Mezey testified that he received respondent's cover memo (dated April 20, 1994) on September 9, 1994, after Mezey met with the OAE representatives to talk about respondent's use of the escrow.

After respondent heard this testimony from Mezey, he conceded that the cover memo that he had given to the OAE in September 1994 had not been sent to Mezey on April 20, 1994 the date on the memo. Respondent's new testimony was that the memo had been sent sometime between April 20, 1994 and June 15, 1994, the date of respondent's first interview with the OAE about this matter. Respondent offered the following explanation for the date mix-up:

> ***After my interview with the Ethics folks in September, they immediately went up to see Fred the next day. He called me and said, What's going on? And we had a discussion about it.
>
> And at that time he said he doesn't recall anything about giving me the permission to use the $10,000, nothing.
>
> I said, Fred, we had several conversations about it. How could you not remember? But as I said, you know, he wasn't paying me and I thought that this was his way of making certain he'd never have to pay me. So I said, Let me look in my file and send you what I can that might remind you. I found the April 20 invoice and I printed off my computer this document from my home computer which was on file at the time but undated because this is filled out at the bottom by hand. I then faxed it to him together with my letter to Mike Sweeney and I suggested a letter he should send correcting his misstatements the day before, and then I hand carried this down and delivered it to Mike, I think, at the Justice Complex down in Trenton and I thought that was the end of that issue.
>
> *** But anyway, so how the dating mistake came about, and I printed off and gave you one if you wanted, a blank that comes out of my computer because the date is not inserted by machine, it's inserted by hand, and when I sent it in September to Mr. Mezey to remind him of what had occurred previously, I thought that it had been sent on the same date so I put it down, and I picked 9:00 a.m. because I usually do stuff first thing in the morning when I am at home and like that.

[T10/29/1996 274–77]

As noted earlier, it is presumed that the presenter's purpose in proving that respondent "faxed" the cover memo to Mezey in

September 1994, instead of April 1994, was to impeach respondent's credibility.

*    *    *    *    *    *    *    *

Another topic brought out at the ethics hearing concerned respondent's failure to give the OAE two relevant communications that he had sent to Mezey on September 9, 1994. The first was a "fax" memo to Mezey attempting to refresh Mezey's recollection about consenting to respondent's use of the $10,000 and asking Mezey to confirm to the OAE that he had given respondent permission to use the funds; the second was a draft of a letter from Mezey to the OAE, which respondent had prepared for Mezey's signature. The first piece of correspondence, respondent's memo to Mezey, read as follows:

> As you are now aware I have been selected for a Demand Audit of my attorney trust account. One of the transactions they have identified for inquiry is my handling of the Drucker Settlement funds. You gave me $10,000 to fund the last aspect of the fee refund in anticipation of a settlement in that amount which Jeremy and I had agreed upon. This was on September 24, 1993. Shortly thereafter in view of the mounting work I was doing on your various matters and since the Drucker matter was itself nearing an end (as to phase 2), I asked you if I could apply the $10,000 towards my fees and you agreed provided that if you were not in a position to fund the settlement when the documentation was in fact ready that I would have to restore the funds and wait for my fees until you have a cash infusion from Brass Castle or from a sale of one or more of your lots at Honeybrook. We both knew that with Drucker in Israel and negotiations on the language of the Release and of an Assignment of his interest in the litigation you were handling still underway that it would be several weeks before the funds were in fact needed and I told you I had a personal need for the cash.

> In any event this is my recollection and I certainly would not have invaded the $10,000 funds you entrusted to me for one purpose without your express permission. This is what I told the Ethics investigators and it is vital to me that you confirm that I did in fact have your permission to apply the settlement funds to my own account (either as an application of fees due me or as a borrowing depending upon whether you were able to replace the settlement funds at a later date.) Since your recollection was not consistent with mine, I would like you to send a letter to Mr. Sweeney now rather than waiting for the transcript of your interview to be corrected.

> My record keeping was somewhat incomplete and I expect to be criticized for this by the auditors but I must persuade them that I did in fact honor the integrity of funds in the account to avoid more serious discipline. Of course, no one has claimed any loss of entrusted funds and no misappropriations in fact occurred. But there were several instances like Drucker where funds were given to me for one

purpose and with the client's permission were used for another purpose (usually a short-term loan to another client while the funds were to be idle in my trust account). They will now attempt to verify that I indeed had permission from client A to use the funds to benefit client B. Yours is the only instance in which entrusted funds were used by me for my own purposes, again with client permission.[5]

I have drafted a letter for you to send and I enclose a cover to my invoice of April 20, 1994 which does reference the fact that you had agreed to apply $10,000 towards my fees in November of 1993 but then those funds had been returned to fund the Drucker payment when you were not in a position to do so. This cover memo can be used to refresh your recollection and you may send it and my invoice to Mr. Sweeney if you like.

This is critically important to me. I regret having to involve you but I really need your support. Thanks.

## [Exhibit P–63]

On that memo respondent handwrote the following:

Thanks! Please send letter today (before you leave for vacation).

The following is the letter that respondent drafted for Mezey's signature, addressed to the OAE:

### Dear Mr. Sweeney:

Further to my interview of last Friday, I have reviewed a recent invoice from Mr. Gifis and do now recall that he did ask my permission to apply the $10,000 I gave him to [sic] as a fee refund for the Drucker matter to his own fee account on the understanding that if I was unable to provide a second $10,000 when the funds were actually needed that he would return the funds. Mr. Gifis had been doing a tremendous amount of work for me on a very limited retainer basis and I was agreeable to this arrangement. And I may well have been able to replace the funds if I had not been obligated to pay some back real estate taxes of about $10,000 on my residence to avoid a sale of a tax certificate on same.

I will correct my transcribed interview to accord with my present recollection when you send me same but in the meantime wanted to set the record straight.

Very truly yours,

Frederick C. Mezey

cc: Steven H. Gifis, Esq.

---

[5] This is not an accurate statement. In the *Boyd* matter, too, respondent used the funds for his own benefit.

**[Exhibit P–64]**

Mezey never sent the proposed letter to the OAE. Asked by the presenter why not, Mezey answered as follows:

Q. *** Do you recall if you ever took Mr. Gifis up on his advise to send me that letter?

A. No, I did not.

Q. Why not?

A. It wasn't correct.

**[T10/28/1996 184]**

It is undisputed that respondent never gave the OAE presenter a copy of the above two communications. Respondent gave this explanation for his omission:

I would have been happy to show it to him. It didn't contain anything that I thought was improper but it was communication from me to Fred asking for a client to help me in recalling correctly what I thought had transpired between us.

**[T10/29/1996 276]**

Later in the hearing respondent declared that he had not given the two documents to the OAE because the presenter had not asked for them.

## III. *THE POLLARD MATTER* (COUNT THREE)

This count charged respondent with knowing misappropriation of escrow funds by lending a $6,500 real estate deposit to one of his clients, without the consent of the parties to the transaction.

On June 16, 1993 Margaret Pollard, respondent's mother-in-law, contracted to buy certain property from Paul and Lisa Lamon. The contract specified that the $6,500 deposit was to be held in escrow by respondent, as the buyer's attorney, until closing of title or the cancellation of the contract. The mortgage contingency clause was deleted by agreement.

On June 16, 1993 respondent deposited the $6,500 in his trust account, in accordance with the agreement. The closing of title took place on July 30, 1993.

Respondent admitted that he did not hold the deposit inviolate in his trust account. Specifically, on July 9, 1993 respondent lent $6,000 of the funds to another client, Katherine Boyd (John Boyd's sister), who needed the money to make a mortgage payment. Respondent explained that he extended the loan to Katherine Boyd in order to win "brownie points with her." According to respondent, Katherine believed that he was improperly favoring her brother, John, in another transaction in which respondent was representing both.

In seven days Katherine repaid the loan, which was unsecured and bore no interest. Respondent never consulted with or received the consent of either his mother-in-law or the sellers to use the deposit monies.

For this impropriety, too, respondent offered a justification. As with the *Boyd* case, respondent claimed that the deposit belonged to Mrs. Pollard, the buyer, because it was a cash sale. Accordingly, respondent argued, he did not have to ask the permission of the sellers for the use of the deposit. As to Mrs. Pollard's affirmative consent, respondent added, that was also unnecessary because he had a power-of-attorney from her; hence, her express consent was not required.[6] Respondent declared that the money was "sitting idle in the trust account *** it was a 5 day loan *** and I felt extremely comfortable about this and I knew that I wouldn't need the $6,500 from my mother-in-law's case until a few weeks down the road ***." Respondent characterized the loan from Mrs. Pollard to Katherine Boyd as an "internal matter." In support of the propriety of his conduct, respondent maintained that he could just as easily have taken the funds out of Mrs. Pollard's personal account, over which he had check-writing power.

---

[6] The power-of-attorney was not notarized. Respondent conceded that this circumstance rendered the power-of-attorney ineffective. Respondent claimed, however, that subsequent notarization would have validated the document.

## IV. *THE JERSEY PRECAST MATTER* (COUNT FOUR)

This count of the complaint alleged that respondent engaged in a conflict of interest situation by entering into a business transaction with a client, and that he made a false statement to a bankruptcy court.

In July 1992 respondent was retained by Leo Jasien and Virgil Carroll, principals in a business known as Jersey Precast Corporation ("Jersey Precast"), to represent the company in various lawsuits and claims involving delinquency of its financial obligations.

On July 27, 1993 Jasien and Carroll authorized respondent to liquidate 4, 620 shares of common stock of New Era Bank, one of Jersey Precast's creditors. Both individuals authorized respondent to liquidate the stock, pay $15,000 to himself for his services, pay $5,000 to Jersey Precast and to invest the balance in his sole discretion until such funds were needed. Respondent was instructed to keep the funds "reasonably liquid." The stated purpose of the liquidation was to assure that enough funds would be available for the professional services required if the corporation filed a Chapter 11 bankruptcy petition.

In August 1993, on three separate dates, respondent liquidated Jasien's and Carroll's stock, in addition to 525 shares owned by Jersey Precast. Respondent deposited the proceeds of the sale, $49,674.22, in his personal brokerage account. By September 2, 1993 respondent had disbursed $49,300, as follows: $6,300 to himself for outstanding legal fees, $3,800 to his trust account to pay the corporation's accountant, $5,000 to Carroll as reimbursement for a loan made to the corporation and $34,574 as "borrowed funds." The borrower was respondent himself. The following day, September 3, 1993, respondent filed a bankruptcy petition on behalf of Jersey Precast.

After the relationship between Jasien and Carroll became sour, on May 10, 1994 counsel for Jasien filed a motion to review and revise a prior order appointing respondent as bankruptcy counsel

for Jersey Precast. In a certification in support of the motion, Jasien demanded the return of his shares of the New Era Bank stock. Respondent filed a reply certification on May 27, 1994, listing the disbursements made from the stock sale proceeds, but omitting that he had borrowed more than $30,000 for his own purposes. The certification stated as follows:

The remaining fund balance was $30,000 and was invested on a short-term, fully liquid basis at a yield of eight (8) percent per annum. The prevailing money market rate was about three (3) percent per annum.

### [Exhibit P–42].

On the return date of Jasien's motion, May 31, 1994, the bankruptcy court discovered that respondent had borrowed some of the trust funds and had not yet repaid the loan. The court ordered respondent to submit an accounting. Respondent filed an accounting with the court along with a supplemental certification dated June 29, 1994, confirming that he had borrowed $34,574 from the trust fund, consistent with the parties' agreement to invest the funds. Respondent also withdrew as counsel to Jersey Precast. On June 14, 1994 respondent sent the borrowed funds, together with eight per cent interest, to new counsel for Jersey Precast.

The formal ethics complaint charged respondent with violation of *RPC* 1.8(a) by failing to advise Jasien and Carroll and Jersey Precast to consult with separate counsel. The complaint also charged him with violation of *RPC* 3.3(a)(5) and *RPC* 8.4(c), in that his first certification failed to disclose to the bankruptcy court that he had borrowed in excess of $30,000 in trust funds. Knowing misappropriation is not charged in this count.

Respondent admitted that he did not advise Jasien or Carroll to consult with independent counsel about the loan transaction with respondent. Respondent explained that he was not familiar with the requirements of *RPC* 1.8. He denied, however, having misled the bankruptcy court. Respondent acknowledged that his first certification was not complete, as it did not contain a full explana-

tion of the circumstances surrounding the use of the funds. He contended, however, that the certification had been prepared in haste, that the information was beyond the scope of the court's inquiry, and that he had not included other details because they were not relevant.

## V. *RECORDKEEPING DEFICIENCIES* (COUNT FIVE)

Following a disciplinary demand audit of respondent's attorney records by the OAE on June 23, 1994, it was discovered that respondent had failed to keep appropriate receipts and disbursements journals, to maintain appropriate ledger cards for each client, to maintain a running balance in the trust account checkbook and to perform quarterly reconciliations of his trust account, in violation of *R.*1:21–6. In his answer, respondent acknowledged these deficiencies. Since the audit, however, respondent has remedied his recordkeeping problems and is now in compliance with the rules.

\*      \*      \*

At the conclusion of the ethics hearing, the special master found that respondent had misused escrow funds and that his disbarment was required.

In the *Boyd* matter, the special master found that, even though the "matter involved consent by the client without notice to or consent by the other party \*\*\* [u]nder *Wilson, Hollendonner* and *Perez* \*\*\* respondent's use of the escrow funds without the purchaser's consent was clearly an unauthorized misappropriation."

The special master found no knowing misappropriation in the *Mezey* matter. The special master concluded that the $10,000 sum was the property of Mezey while in respondent's possession. Accordingly, the special master determined that Mezey's consent to respondent's use of the funds was a legally sufficient defense. As pointed out by the OAE, however, the special master mistakenly believed that Mezey had sent to the OAE the letter drafted by

respondent for Mezey's signature, by which respondent wanted Mezey to acknowledge his consent to respondent's use of the money. A reasonable reading of the special master's report suggests that the basis for his finding that the monies belonged to Mezey was Mezey's acknowledgment to the OAE of his consent. Mezey, however, did not send that proposed letter to the OAE because, he stated, its contents were incorrect.

Although the special master did not find respondent guilty of knowing misappropriation, he concluded that respondent's use of the funds had been

a blatant breach of the commitment he made to opposing counsel on September 13, 1993 *** that he would obtain the $10,000 from his client, hold the money in escrow and not make distribution for any purpose until the settlement documents were executed and delivered. At the very least, his use of the $10,000 without notice to opposing counsel under the circumstances was professional misconduct—conduct involving misrepresentation and conduct prejudicial to the administration of justice—in violation of RPC 8.4(c) and (d).

In *Pollard*, the special master found that respondent's use of the $6,500 deposit without Mrs. Pollard's knowledge and consent was a knowing misappropriation. The special master pointed out that Mrs. Pollard took a direct interest in the purchase transaction and that she did not leave it up to respondent to handle the matter for her through the power-of-attorney. The special master noted that Mrs. Pollard had personally signed the contract, as well as prepared and signed the deposit check. The special master further remarked that, because Mrs. Pollard had signed a contract "directing respondent to hold the deposit in escrow until transfer out of title, that directive, executed by her on June 16, 1993, had superseded the general power-of-attorney, at least as to the handling of the escrow ."

In the *Jersey Precast* matter, the special master found that respondent violated *RPC* 1.8(a) because he failed to advise Jasien and Carroll to seek independent advice of counsel and failed to obtain in writing their consent to the representation. The special master also found that respondent's failure to disclose to the bankruptcy court that he had borrowed $30,000 in escrow funds

was a material misrepresentation, in violation of *RPC* 3.3(a)(5) and *RPC* 8.4(c).

Lastly, the special master found that respondent failed to maintain the accounting records required by *R.*1:21–6, in violation of *RPC* 1.15.

As noted above, the special master concluded that, under *In re Wilson*, 81 *N.J.* 451, 409 *A.*2d 1153 (1979), and *In re Hollendonner*, 102 *N.J.* 21, 504 *A.*2d 1174 (1985), respondent must be disbarred.

\*    \*    \*

Following a *de novo* review of the record, the Board is satisfied that the Special Master's conclusion that respondent was guilty of unethical conduct and, more specifically, knowing misappropriation, is fully supported by clear and convincing evidence. For the reasons expressed below, the Board disagreed with the special master's finding that respondent's conduct in the *Mezey* matter did not constitute knowing misappropriation.

As to the *Boyd* matter, the Board was persuaded that respondent's withdrawal of the $51,000 deposit without the consent of the buyers constituted knowing misuse of escrow funds, contrary to *In re Hollendonner*, 102 *N.J.* 21, 504 *A.*2d 1174 (1985).

There is no dispute that the $51,000 deposit was to be held in escrow until closing of title. There is also no dispute that, on the same date the contract was signed, respondent used the deposit for his own purposes, without the Hofers' or their attorney's knowledge and consent. Respondent now recognizes that his conduct was wrongful. According to respondent, however, he believed at the time that the Hofers' consent was not required because he thought that the deposit belonged exclusively to John Boyd, who had given him consent to use the funds.

The basis that respondent advanced for his belief was his understanding of the transaction as a cash sale, not subject to a mortgage contingency clause. In other words, in respondent's view, the absence of a clause allowing the Hofers to cancel the

contract if they did obtain a mortgage loan turned the transaction into an unqualified deal. Of course, respondent was wrong. A number of other still unfulfilled contingencies could have rendered the transaction null and void before the closing of title. In that case, the Hofers could have legitimately demanded the return of their deposit. A few examples were the clauses dealing with termite inspection, radon inspection and building inspection. Title defects and damage by fire, too, would have entitled the Hofers to the refund of their deposit. In fact, respondent conceded that the foregoing provisions could have caused the transaction to fall through. Near the close of the ethics hearing, respondent also admitted to the special master that the *Boyd to Hofer* agreement was an executory contract[7] and that Boyd could not have been the owner of the funds until closing actually occurred. Respondent acknowledged that Boyd might have been the equitable owner of the funds, while the Hofers were their legal owners.

If respondent were only an attorney, not a former law school professor, conceivably it could be found that he made a mistake of law in not taking into account or interpreting all of the contingencies in the contract. To be sure, such a mistake of law would not have exonerated respondent from responsibility for knowing misuse of escrow funds. *In re Eisenberg*, 75 *N.J.* 454, 383 *A.*2d 426 (1978). But respondent's status as a law professor—and, moreover, a professor of contracts—makes it unbelievable, indeed absurd, that he innocently failed to consider the contingency clauses in deeming the transaction unqualified.

For the above reasons, the Board was unable to give credence to respondent's claims that he believed the agreement of sale to

---

[7] Black's Law Dictionary defines an executory contract as "a contract that has not as yet been fully completed or performed. A contract the obligation (performance) of which relates to the future ." It also defines an executory contract to sell as a "contract under which something remains to be done by either party before delivery and passing of title."

be, in essence, irrevocable and the deposit to be the exclusive property of Boyd.

The following extra considerations add strength to the Board's conviction that respondent did not have a good faith belief that the deposit belonged to Boyd alone:

- The contract provided that, even in the absence of contingencies, the parties could void the sale upon mutual agreement.

- Respondent showed great insensitivity to or lack of comprehension of his obligation as the holder of trust or escrow funds. He admitted that, in other real estate transactions, he had allowed one of the parties to use the deposit prematurely. Respondent saw nothing wrong with this practice so long as the obligation to repay was secured by a second mortgage on the property.

- The documents pertaining to the *Boyd* transaction and, in particular, the RESPA statement show that, contrary to respondent's argument that the $51,000 belonged to Boyd, at the closing of title that money would not have gone to Boyd at all. Every penny was needed to pay substantial liens on the property. The RESPA statement reveals that Boyd owed approximately $478,000 to United Jersey Bank and that the closing costs amounted to almost $34,000. The purchase price listed on the RESPA statement was $508,000. The liens and the closing costs exceeded the purchase price by approximately $2,000. Accordingly, the Boyds had to bring that cash amount to the closing, over and above the purchase price, to satisfy all their closing obligations. Under these circumstances, no monies from the sale would be going to Boyd and, therefore, respondent's claim that the $51,000 belonged to Boyd must fail. It is true that, at one point during the hearing, respondent mentioned that he and Boyd did not know that the $90,000 second mortgage loan owed to the UJB would have to be paid off at the closing of this property. Respondent alluded to the transfer of this debt from Boyd's Long Island house to the Castle Howard Court house. However, respondent testified at the ethics hearing that, during his discussion with Boyd about the use of the deposit, they considered that the money might be needed for the closing. Respondent then added, "[p]erhaps we were both thinking that the bank might require a premature payment of the second mortgage." Respondent's testimony, hence, shows that he and Boyd discussed very early on that it might be necessary to pay off the second mortgage from the *Boyd to Hofer* closing proceeds.

- The special master asked respondent how he could have felt comfortable in using the deposit if he admitted that the Hofers were the legal owners of the money. Respondent replied that he felt comfortable because he was using the deposit for a short term and, in the event that the Hofers required the funds back, he would have returned them. In fact, throughout these proceedings respondent repeated that he saw nothing wrong with the use of the deposit because there was a period of only about a month between the signing of the contract and the closing date and because he would have returned the monies, if necessary. This makes it obvious that respondent was confusing the *ability* to

replace the funds with the *prohibition* against touching those funds. Respondent thought that, so long as he was able to return the money on time for each transaction, the use of the escrow funds was not improper because they were sitting idle in his trust account.

- Respondent had a motive for using the deposit: his admitted financial needs at the time. He testified, in connection with the *Boyd* matter, that he was having difficulty carrying a $100,000 note representing a loan from him to Boyd and that, when the Hofers paid their deposit, he asked Boyd if he could use the deposit to satisfy his obligation.
- Some of respondent's statements to the OAE and his actions following the OAE's discovery of his ethics offenses call his credibility into question. For example, it is undisputed that respondent used the entire $51,000 deposit for his own purposes, whether personal or business. Yet, at a pre-hearing interview, respondent told the OAE that he had utilized the funds for "other client requirements *** some of which was used for [Boyd's] benefit, some for the benefit of other people *** the first use of the funds was used for a default on the underlying loan with United Jersey Bank to keep that transaction from going sour while the closing was going forward *** [Boyd] had some very pressing needs *** the money was being loaned on a short-term basis to accommodate other client's needs ***." **Exhibit P–1.**

The Board was convinced, thus, that respondent could not have reasonably believed that the deposit belonged exclusively to Boyd and that respondent had to know that the consent of the Hofers was also required. It is elementary that

upon the deposit in escrow a contract between the parties as to the delivery by the depositary of its subject matter is created; the depositary becomes the agent for both parties as to such delivery; and neither party can alone rescind.

[*Cooper v. Bergton,* 18 *N.J.Super.* 272, 277, 87 *A.*2d 358 (1952)]

*** [An escrow] arrangement involves an intermediary with obligations to parties on both sides of the transaction.

[*Estate of Louis Kamm, Deceased, et al. v. Commissioner of Internal Revenue Service,* 349 *F.*2d 953 (3d Cir.1965)]

A definition of escrow is also found in a law dictionary authored by respondent:

A written **instrument,** such as a **deed,** temporarily deposited with a neutral third party (called the ESCROW AGENT), by the agreement of two parties who have entered into a valid **contract.** The escrow agent will hold the document until the conditions of the contract are met, at which time he will deliver it to the **guarantee** or **obligee.** The depositor has no control over the instrument after it is in escrow ***. Money so deposited is also loosely referred to as 'escrow.' [Original emphasis].

[Steven H. Gifis, Law Dictionary 174 (4th ed.1996)]

All of the foregoing leaves the Board with no doubt (1) that respondent knew that, in escrow agreements, the agent has obligations to both parties to the arrangement; (2) that he knew that the *Boyd to Hofer* had several unfulfilled contingencies; (3) that he knew that the $51,000 deposit was not Boyd's alone; (4) that he knew that the Hofers' consent to his use of the escrow was required by law; and (5) that he knew that by not securing the Hofers' authorization he was engaging in conduct constituting knowing misuse of escrow funds.

Indeed, respondent was not a "babe-in-the-woods." He was an accomplished law school professor for some fifteen years, teaching, among other subjects, contracts. Nor was he a novice or inexperienced attorney. Although he claimed that he had practiced law only sporadically during his tenure with the law school, from 1983 through 1989 he was general counsel to a public corporation in Princeton. In June 1990 he opened his own office and became a sole practitioner. At the time of the *Boyd* transaction respondent had had his law practice for four years. In addition, he had managed a trust account since 1970, while he was still teaching at the law school.

Respondent's second defense is that he could not have knowingly misappropriated the deposit in escrow because he was unaware of *In re Hollendonner, supra,* 102 *N.J.* 21, 504 *A.*2d 1174 (1985), which dealt with the knowing misuse of escrow funds. Clearly, however, the requirement of knowledge in knowing misappropriation cases is not conditioned on knowledge of the law. It is well-settled that ignorance of the law does not diminish responsibility for an ethics violation. *In re Eisenberg, supra,* 75 *N.J.* 454, 383 *A.*2d 426 (1978). It is the knowledge that the money belongs to the parties to the escrow agreement and that they have not authorized the taking by the attorney, either by stealing or by borrowing it, that is the essence of the disbarment rule of *In re Wilson,* 81 *N.J.* 451, 409 *A.*2d 1153 (1979), and *In re Hollendonner, supra,* 102 *N.J.* 21, 504 *A.*2d 1174 (1985). *In re Noonan,* 102 *N.J.* 157, 506 *A.*2d 722 (1986). Here, the Hofers did not authorize

respondent's use of the $51,000. That alone warrants respondent's disbarment for knowing misappropriation of escrow funds.

In short, the finding that respondent knew that his borrowing of the *Boyd to Hofer* deposit was improper is inevitable.

\*    \*    \*

In *Mezey*, too, respondent knowingly misused funds that should have remained inviolate in escrow. The record supports the conclusion by clear and convincing evidence that there was a firm settlement agreement between respondent and Doppelt on September 13, 1994, before respondent used the funds, and that respondent misused funds escrowed specifically for the settlement, in violation of *Hollendonner*.

As stated in the factual recitation of this matter, sometime before September 13, 1994 respondent and Doppelt had many telephone conversations in the nature of settlement negotiations and at last reached a settlement for the payment of $10,000 to Doppelt, in exchange for (1) Drucker's general release of all claims against Mezey and/or his law firm and other parties, (2) the assignment of proceeds, if any, that might be recovered by Mezey in certain actions against Drucker, (3) the delivery of a warrant to satisfy judgment, (4) Doppelt's withdrawal of an appeal and (5) other minor conditions.

Doppelt's September 13, 1993 letter to respondent clearly stated: "[w]e have agreed to settle both of the above-captioned matters on the following terms and conditions." The letter did not contain an offer of settlement or propose certain changes to a negotiated settlement. Its obvious purpose was to confirm the settlement and to memorialize the terms and conditions agreed upon in the course of many telephone conversations between Doppelt and respondent. The letter also made it plain that the deposit of $10,000 in respondent's trust account was an essential condition to the agreement and that the purpose for the escrow was to secure performance by Mezey, whom Doppelt greatly mistrusted. Respondent himself acknowledged that Doppelt con-

sidered Mezey "dishonest" and a "deadbeat." **Exhibit P–1 at 27.**
It is obvious, thus, that Doppelt viewed the posting of the $10,-
000—and the clearing of the check—as a condition precedent to
the finalization of the settlement.

Yet, after receiving Doppelt's letter, respondent did nothing to
correct a possible misunderstanding on Doppelt's part that they
did not have a firm settlement. Indeed, respondent signed the
bottom of the letter acknowledging that it accurately reflected the
terms of the settlement "which we have entered into" and at the
same time "faxed" a memo to Doppelt with some "minor modifica-
tions" suggested by Mezey who, according to respondent's state-
ment in that letter, was otherwise in agreement with the terms set
forth in Doppelt's correspondence. The minor modifications sug-
gested by respondent were intended to refine the terms in two
instances and, in the third, to remind Doppelt of his earlier
promise to withdraw his appeal. Respondent's suggestions were
not changes, but merely clarifications of the agreed upon condi-
tions. In fact, respondent acknowledged that he and Doppelt had
a settlement at that time. Respondent testified as follows: *"After
we reached the settlement,* I promised [Doppelt] I'd stand behind
him, he immediately notified the court, sent in the [September 24,
1994] letter and never asked me whether I received the payment
from Fred, not once." [Emphasis added]. Through these words
respondent acknowledged that he and Doppelt had reached a
settlement before Doppelt communicated its terms to the court on
September 23, 1994 and before Doppelt sent his letter of Septem-
ber 24, 1994 to Judge Rockoff. All of this took place before
respondent used the monies, October 8, 1994. On his memo to
Doppelt of September 13, 1994, too, respondent stated his assump-
tion that Doppelt would draft a *settlement* agreement and asked
Mezey to deliver as soon as possible the *settlement* funds in the
amount of $10,000. Clearly, respondent would not have asked
Mezey to forward him the funds as soon as possible if he was not
convinced that he and Doppelt had a settlement agreement. And
even if it could be found that the parties had not yet reached a

final settlement by the time that Doppelt sent his letter to respondent on September 13, 1994, surely there was a firm agreement when, on that same date, Doppelt accepted the minor modifications suggested in respondent's memo of even date. Barely three weeks later, respondent appropriated the $10,000 to his own use.

In sum, the evidence establishes clearly and convincingly establishes (1) that both Doppelt and respondent believed that they had a final settlement long before October 8, 1994, the date of respondent's use of the monies; (2) that there were no "significant issues to be negotiated and resolved," as respondent argued; (3) that even Mezey believed that the case had been settled, as he so testified; (4) that the purpose of the deposit of the $10,000 in respondent's trust account was to secure performance of the agreement reached; (5) that Doppelt relied on respondent's fiduciary obligation, as escrow agent, to safeguard the monies in his trust account; (6) that Doppelt would not have delivered to respondent the general release, the assignment and the warrant to satisfy judgment if he had known that the funds had been removed from respondent's trust account; (7) that Mezey could not have asked for the return of the monies without breaching the settlement agreement; (8) that respondent would have been personally liable, as escrow agent, if he had returned the monies to Mezey; and (9) that respondent knew that he was wrong; respondent conceded that he deliberately avoided using the words "escrow funds" or "trust account deposit" in his communications with Doppelt.

It is unquestionable, thus, that the $10,000 were escrow funds designed to guarantee performance by Mezey, that respondent knew the true nature of the funds and that he had a duty to maintain those funds intact until the completion of the settlement. Under these circumstances, a conclusion that he misused the escrow funds with deliberation and knowledge is inescapable.

Even if it could be found that the monies were not escrow funds, but instead Mezey's funds alone, respondent would still be guilty of knowing misappropriation because he did not satisfy his burden of showing that he had Mezey's consent to the use of the funds.[8] Mezey denied being aware of or having consented to respondent's use of the money. When respondent attempted to persuade Mezey to acknowledge to the OAE that he had given his approval to respondent's use of the $10,000, Mezey refused because the terms of respondent's proposed letter to the OAE were "incorrect." Without Mezey's consent, respondent's use of the funds constituted an unauthorized taking of the funds under *Wilson* and *Hollendonner*.

Incidentally, even if any weight and credibility were accorded to respondent's attempts to refresh Mezey's recollection about the consent, it is unquestionable that respondent's communications to Mezey alluded to a November 1993 date for the consent. Respondent, however, utilized the funds before November, on October 8, 1993. Mezey's consent, thus, even if given, would have post-dated respondent's use of the funds.

In light of the foregoing, the Board concluded that the proofs clearly and convincingly demonstrate that respondent knew that the $10,000 were to remain in escrow, that he could not utilize them without Mezey's and Drucker's (or Doppelt's) consent and that he knowingly misused them by withdrawing them from escrow without either party's authorization. The motive for respondent's misappropriation was the financial straits that saddled him at the time. Despite respondent's protestations to the contrary, his need of a cash infusion was evident. Respondent testified that he had told Mezey that he "could use the money in the interim," that he could solve "[his] own immediate problem that way" and that he asked Mezey if he could use the money

---

[8] *R.* 1:20–6(c)(2)(C) states that the burden of going forward regarding defenses *** shall be on the respondent.

"because [he] really needed it." In addition, in a memo to Mezey, respondent alluded to "a personal need for the cash." **Exhibit P–63.** Respondent also admitted that he "stalled" Doppelt for approximately ten days because he was waiting to receive a fee from a case to send the $10,000 to Doppelt.

For all the above reasons, the Board found that respondent knowingly misappropriated the *Mezey* escrow funds, in violation of *In re Hollendonner*, 102 *N.J.* 21, 504 *A.*2d 1174 (1985).

&ast;   &ast;   &ast;

The third instance of respondent's knowing misappropriation occurred in the *Pollard* matter. There, he removed a $6,500 real estate deposit from escrow and lent it to a client to curry favor with her. The deposit, paid by respondent's mother-in-law as the buyer of real property, should have remained in escrow until closing of title.

Respondent's explanation for using the deposit as a loan to Katherine Boyd, instead of using other funds, is indicative of his total disregard for the need to preserve the integrity of trust funds. He testified that he had taken the monies from the trust account as a matter of convenience and because they were sitting idle in the account. He added that he "viewed [the deposit] as funds under my control and I felt they were perfectly safe in the transaction, as safe as they were in my trust account."

Once again, respondent violated *Hollendonner.* Not only did he fail to obtain proper consent from Mrs. Pollard, but he did not attempt to get the sellers' permission to use the deposit. This was so, he argued, because he viewed the deposit as Mrs. Pollard's property, inasmuch as there was no mortgage contingency clause. As correctly pointed out by the OAE, however, respondent cannot be allowed to change positions to suit his convenience. In *Boyd,* respondent claimed that the deposit monies belonged to Boyd, the seller, because there was no mortgage contingency; in *Pollard,* respondent contended that the deposit belonged to Mrs. Pollard, the buyer, because she did not need a mortgage. Clearly, respon-

dent's claims of innocence cannot be considered seriously when it is obvious that they are the product of afterthought and rationalization to excuse conduct that he knew was wrong. It is clear from the record that, regardless of the character of the real estate transaction, the parties had agreed that the deposit would not be released from escrow until closing of title.

Additionally, as pointed out by the special master, the evidence does not support the finding that respondent had Mrs. Pollard's authority to handle all aspects of the real estate transaction. Mrs. Pollard had an active role in the transaction; she signed the contract of sale, wrote the check for the deposit and also signed it. She did not, thus, direct or allow respondent to perform in her behalf all acts incidental to the purchase. Even if she had, the specific escrow provision in the contract preempted respondent's general authority conferred by the power-of-attorney.[9]

Here, too, respondent violated his duty to maintain the integrity of the escrow funds until closing of title by knowingly misusing them. Once more, respondent acted contrary to *In re Hollendonner, supra*, 102 *N.J.* 21, 504 *A.*2d 1174 (1985).

\*       \*       \*

In the *Jersey Pre–Cast* matter, respondent also acted unethically. For the same reasons expressed in the special master's report, the Board found that respondent violated *RPC* 1.8(a), *RPC* 3.3(a)(5) and *RPC* 8.4(c).

Finally, respondent concededly committed serious recordkeeping violations, as charged in count five of the complaint.

\*       \*       \*

---

[9] It should also be remembered that, even if respondent was acting under a valid power-of-attorney, his conduct might have been void as an abuse of power. A power-of-attorney is granted to an agent for the protection of the principal. Here, respondent put Katherine Boyd's interests above those of Mrs. Pollard, in an obvious attempt to favor Boyd.

This matter is distinct from the cases cited by respondent in his several briefs. In *In re Flayer*, 130 *N.J.* 21, 611 *A.*2d 1111 (1992), the attorney prematurely released escrow funds to himself, as a party to the escrow agreement, when the other party, the builder of the house he had recently purchased, ignored his letters complaining about the non-performance of promised repairs. Flayer then arranged for the repairs himself and used the funds escrowed for such purposes. Unlike this respondent, however, Flayer released the money to a party to the escrow agreement—himself. He did not impermissibly borrow funds to which he was not entitled, as did this respondent.

In *In re Susser*, 152 *N.J.* 37, 702 *A.*2d 1006 (1997), the attorney made an early disbursement of escrow funds to a party to the escrow agreement, deriving no personal benefit from his conduct. Again, the distinction between *Susser* and this matter is that this respondent improperly borrowed the monies for his personal benefit.

In *In re Rogers*, 126 *N.J.* 345, 599 *A.*2d 141 (1991), the Court found no knowing misappropriation from the attorney's failure to pay off a client's mortgage following a closing. The Court reasoned that respondent's good faith belief that he had the mortgagee's consent to assume the client's debt was a defense to the charge of knowing misappropriation of the mortgage pay-off funds. In this case, no such reasonable, good faith belief on respondent's part can be found. In *Boyd*, respondent had to know that certain contingency clauses in the contract negated the character of the transaction as an unqualified purchase; respondent could not have reasonably believed that the sale was non-contingent and that, therefore, the deposit made by the buyers was non-refundable. In *Mezey*, respondent did not obtain Doppelt's or Mezey's permission to borrow the escrow funds while the settlement documents were being prepared. And in *Pollard*, respondent did not secure from either party the approval for the use of the deposit monies before the closing. As in *Boyd*, his alleged belief that the *Pollard* deposit was non-refundable was not

based on reason; the contract expressly called for the holding of the deposit in escrow, pending settlement.

Lastly, in *In the Matter of Frost*, DRB 97–168 (December 16, 1997), the Board found no clear and convincing evidence that the attorney did not have an agreement with counsel for the judgment-creditor to negotiate other forms of satisfaction of the judgment. In fact, Frost and the attorney had negotiations about the payment of the debt. The Board considered in that case that Frost might have thought that, because of his negotiations with counsel for the judgment-creditor, the conditions of the escrow agreement had been fulfilled. Moreover, the money went to pay fees to which Frost was entitled; he did not borrow the money, unlike respondent, who knew that he had no entitlement to the funds. Indeed, in each instance respondent promised to repay the loan before the escrow monies were due.

Respondent's actions fall squarely within the conduct exhibited in *Hollendonner*. He borrowed deposit monies or settlement funds that should have remained unspent, without securing the permission of all parties to the escrow agreement.

\*     \*     \*

Having found that respondent knowingly misappropriated escrow monies on three occasions by improperly borrowing either for himself or for others funds that should have remained untouched in his trust account until the occurrence of certain events, the Board must recommend respondent's disbarment. Since 1979, attorneys who have stolen or borrowed trust funds without the client's consent have been invariably disbarred. *In re Wilson*, 81 *N.J.* 451, 409 *A.*2d 1153 (1979). Similarly, attorneys who steal or borrow escrow funds without the permission of the parties to an escrow agreement face disbarment. *In re Hollendonner*, 102 *N.J.* 21, 504 *A.*2d 1174 (1985). "The parallel between escrow funds and client trust funds is obvious. So akin is the one to the other that henceforth an attorney found to have knowingly misused escrow funds will confront the disbarment rule of *In re Wilson, supra*, 81

*N.J.* 451, 409 *A.*2d 1153." *In re Hollendonner, supra,* 102 *N.J.* at 28, 504 *A.*2d 1174.

It is not without a sense of regret that the Board recommends respondent's mandatory disbarment. After all, disbarment signals the demise of respondent's rewards from his impressive accomplishments as a law student and law professor. Nevertheless, the Board's regret is attenuated by the unavoidable feeling that respondent's departure from ethics standards was the product not of isolated instances of poor judgment that at times may assault even individuals of the highest morals, or the result of constraints that frequently accompany the practice of law, or the fruit of heartrending adversity that sometimes impels attorneys in the direction of ethics malfeasance—psychiatric illness, dire financial straits, sickness or death of a loved one. Insensitivity to basic ethics tenets, unimaginable disregard for the consequences that inevitably flow from behavior that is prohibited—even arrogance—seem to define respondent's character. His unwillingness to recognize his misconduct was also glaring from the record. Confronted with evidence of his grievous misconduct, respondent refused to acknowledge responsibility for any wrongdoing, displaying not a morsel of contrition or regret. Under these circumstances, disbarment of this respondent should not appear harsh even to the staunchest critics of the inexorable *Wilson* rule.

The Board unanimously recommends that respondent be disbarred.

The Board also determined to require respondent to reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

/s/ Lee M. Hymerling
LEE M. HYMERLING
Chair
Disciplinary Review Board

Dated: 6/10/98