599 A.2d 141
IN THE MATTER OF LEE JASPER ROGERS,
AN ATTORNEY AT LAW.

Argued September 10, 1991—Decided December 6, 1991.

*Thomas J. McCormick*, First Assistant Ethics Counsel, argued the cause for Office of Attorney Ethics.

*Michael D. Schottland* argued the cause for respondent (*Schottland, Vernon, Aaron & Costanzo*, attorneys).

PER CURIAM.

The District IX Ethics Committee (DEC) filed a presentment against respondent, Lee Jasper Rogers, following an audit and investigation that began after respondent's bank notified the Office of Attorney Ethics (OAE) of an overdraft on respondent's trust account. The DEC found that respondent had knowingly misappropriated funds in two separate real estate matters, one involving the purchase of property by the Hulls, respondent's clients, from the Homers (count one), and the second involving the collection of rent for respondent's client Walter Perry (count two). The DEC also determined that respondent had failed to inform the Hulls of the difficulties he had encountered with their purchase of separate property from the Stockhamers and that he had also neglected to disclose that

the mortgage on their property had not been satisfied (count three). In count five the DEC found that respondent had created a conflict of interest with Perry by entering into a business transaction with him without full disclosure of the relevant facts. The DEC concluded that respondent had violated the trust-account requirements embodied in *RPC* 1.15(a) and (d). The DEC later withdrew the misappropriation claim in count three arising out of the Hulls' purchase of the Stockhamer property, and recommended dismissal of count four, which alleged that respondent had tampered with a witness, Perry. The Disciplinary Review Board (DRB) unanimously concurred with the DEC's recommendation that count four be dismissed. The DRB likewise recommended dismissal of counts two and five concerning Perry because they had not been proven by clear and convincing evidence. However, the DRB unanimously agreed that respondent had violated *RPC* 1.4(a) and (b) in failing to keep the Hulls informed (count three). A six-member majority of the DRB held that respondent had knowingly misappropriated the escrow funds in connection with the Hull–Homer real estate transaction and recommended disbarment. Three members of the DRB found that respondent had believed he had a good faith loan with the mortgagee, Bernard Yagoda, and therefore had not knowingly misappropriated the escrow funds. Those three members recommended that respondent be suspended from the practice of law for two years.

Our independent review of the record leads us to conclude that a two-year suspension is the appropriate discipline.

## I

Respondent, a member of the bar since 1981, was a sole practitioner in Red Bank during the years at issue. Since January 26, 1991, respondent has been employed by the Ocean County Public Defender's Office as a staff trial attorney.

The most serious count against respondent arises from his representation of the Hulls in their purchase of property from

the Homers. The closing occurred on March 10, 1987. As settlement agent, respondent deposited $69,195.26 in his trust account, all of which was properly distributed except for the funds held to pay off the Yagoda mortgage. Respondent was required to discharge the first mortgage of $29,289.31 that Yagoda held on the property. Respondent issued an attorney trust account check in that amount to Yagoda. The check was returned for insufficient funds as the result of a $3,453.87 levy that American Express had placed on respondent's trust account to satisfy his personal obligations to that company. Respondent did not learn of the levy until the bank returned the dishonored check. But for that levy respondent would not have been out of trust.

Respondent immediately telephoned Yagoda and told him of his problems with American Express. Yagoda agreed to accept an initial payment of $25,789.31 and to receive the balance of $3,500.00 as soon as respondent's financial difficulties had been resolved.

On March 24, 1987, respondent mailed a certified check to Yagoda in the amount of $25,789.31 and a letter that stated "the balance of the monies in the amount of $3,500.00 will be paid to you in approximately one (1) weeks [sic] time." Respondent also returned the mortgage that Yagoda had previously sent him for cancellation. Respondent sent a copy of the letter to the Hulls, but did not inform them that, contrary to their settlement arrangements, Yagoda still retained a mortgage on the property.

Respondent notified the collection agent for American Express that the funds levied did not belong to him, that they were "for disbursement with regard to a real estate closing which was recently held in my office." Respondent requested immediate return of the funds. American Express promised to return them but did not do so for approximately two months. Finally, on May 21, 1987, respondent received a check from

American Express for $3,245.54 (the amount of the levy less unspecified costs totalling approximately $200).

Respondent's ethical troubles began at that point. Rather than depositing the check in his trust account, which had a balance of $11.27, and paying Yagoda, he deposited it in his own overdrawn business account. From that fund, respondent paid Yagoda $1,000, paid Jersey Central Power and Light $1,000, and applied the remaining amount to other pressing business and personal debts.

In July and August of 1987, three additional payments totalling $1,500 left a balance of $1,000 still due and owing to Yagoda. Finally, Yagoda obtained a default judgment against respondent on May 26, 1989, for $1,349.86, representing the debt plus costs. Yagoda also instituted suit against the Homers, the former owners of the property.

On September 3, 1988, unaware of respondent's troubles in the earlier transaction, the Hulls retained respondent to represent them in their purchase of property from the Stockhamers. Respondent never advised the Hulls that Yagoda had instituted a lawsuit against respondent and had been awarded a default judgment, and, most importantly, that respondent had failed to use the American Express funds to pay off the mortgage on their property. After encountering difficulties in connection with the Stockhamer closing, the Hulls fired respondent and hired a new attorney.

When the Hulls attempted to sell the property they had purchased from the Homers, their buyer discovered the Yagoda lien. The Hulls were forced to pay Yagoda the amount of the judgment, $1,349.86, in exchange for an assignment of the judgment. That transaction delayed the closing for five months while the Hulls attempted to acquire sufficient funds to satisfy the judgment. In July 1989, respondent signed a promissory note acknowledging a $2,003.00 debt to the Hulls and agreeing to reimburse them for the amount of the outstanding judgment and for an additional sum of $700 that the Hulls had

given respondent in connection with the Stockhamer transaction. As of March 1, 1991, the date of the DRB decision, respondent had paid only $400 of that total debt.

Respondent testified that he did not deposit the American Express check in his trust account because he was "in a big hole financially." His testimony is summarized in the Decision and Recommendation of the DRB:

Respondent testified that during this time he was in dire financial straits. In 1983, he had purchased a rooming house, a "dump," as he described it. Numerous and extensive repairs had to be made on the property, as required by the Department of Community Affairs. In 1985, respondent advanced $6,000 to a contractor who failed to perform the work. Although respondent obtained a judgment against the contractor, the latter was judgment-proof. In late 1986, the Department of Community Affairs filed suit against respondent for failure to make the required repairs. As a result, respondent was fined $11,000. After he exhausted his savings and borrowed monies from his mother, he was left with no funds. In addition, the mortgage payments on the property became delinquent when the rents received proved insufficient to cover the carrying expenses, including oil and electric bills. In October 1987, the mortgagee filed a foreclosure action.

Respondent was also beset with personal problems. He had received a letter from a matrimonial attorney, advising him that his wife had consulted with the attorney about starting divorce proceedings.

According to respondent, he owed $1,400 to the electric company. When he received the check from American Express,

... it was kind of like Manna. I mean when the mailman walked into the office, I was standing in the dark.

Because Jersey Central Power and Light came by and shut my electricity off. That check was like Manna from heaven. I rationalized to myself. "Well, hey, even if I give it to [Yagoda] it's going to be short because I owe him $3,500." I said, "Well, I already promised to pay him. What I will do is I'll use this money towards my debts and then I will take care of the mortgage as soon as I can." I was arranging to refinance. I figured I would pay him off. I promised him he would get his money. I said, "Okay, I will pay him off when we refinance."

Respondent acknowledged that, in retrospect, he should have paid Yagoda with the American Express check. He added, however, that

I legitimately thought I had a right to use that money based on the promise that I had made to Mr. Yagoda, telling him that I would be responsible, I would make sure that he got his money. I felt I had a legitimate right to use it.

At the DEC hearing OAE Chief Auditor Gerald Smith testified that when he interviewed respondent on March 27, 1991,

respondent told him that when he received the American Express check, his utilities had been shut off due to non-payment of the bill. Smith also related that respondent told him that he had "panicked" and had used the returned funds to pay his business and personal expenses. Smith testified that respondent admitted that they were trust funds and that he said "I guess I dipped a little deeper than I should have." According to Smith, respondent was "tearful and expressed remorse" for his actions.

Respondent's defense, as expressed by his attorney, is that "in his mind [respondent] substituted in place of $3,400 that he was short that was Yagoda's, he substituted his promise to pay that back, his own personal moral promise to pay that back. That's why he felt comfortable [in issuing those funds to pay his bills]." When asked on cross-examination, however, respondent testified that he had had no special arrangement with Yagoda to pay the money back.

A. Special arrangement, no, I didn't say anything about that. I said he had made several phone calls to me inquiring about the status of the money and I just kept giving him assurances that he would be paid.

Yagoda, however, testified that he had only given respondent additional time to pay the balance of the mortgage but that he had not made a special arrangement or loan.

Q. Did you yourself personally make any special arrangements whereby Mr. Rogers could take his time in making payments of this loan?

A. Mr. Rogers and I discussed this over the phone. He asked for additional time. I gave him the time. Apparently he ran into more difficulty and he couldn't conform to the time frame that he volunteered and at the latter part the monies were not coming forward as discussed. I can't give you a time frame, specifics or dates.

* * * * * * * *

Q. Did you ever consider that the $3500 that he was short on the mortgage pay off—did you ever consider that you were loaning that money to Mr. Rogers?

A. Loaning it, no. I was never consulted about a loan other than the fact that there was a shortage at the time the money was due.

At the conclusion of the DEC hearing, the DEC found that respondent had violated *RPC* 8.4(c) because his use of the funds

constituted "dishonest, fraudulent, deceitful" conduct. Additionally, the DEC found that respondent had violated *RPC* 1.15(a) "in that he did not hold the American Express refund check separately by redepositing it in his trust account," and *RPC* 1.15(d) by not properly designating his trust as an "attorney trust account," as required by *R.* 1:21–6.

## II

Counts two, four, and five concern respondent's dealings with his lifelong friend Walter Perry. Sometime in 1987, Perry retained respondent to evict his tenant, Mamie Boyd, for nonpayment of rent. On May 22, 1987, Ms. Boyd paid respondent $1,600 in back rent. Shortly thereafter, respondent prepared an agreement, which Perry signed on August 26, 1987. Under that agreement Boyd was to pay the rent directly to respondent who would act as Perry's rental agent for a five percent commission on the gross monthly income. The agreement also stated that

[m]onthly statements of account showing itemized income and expenses will be given to you on or before the fifteenth of each month. I will set up and maintain a trust account in the name of the property and will forward to you a monthly check for all funds which exceed a base amount of $500.00 which will be kept to cover expenses and emergencies.

On June 2, 1987, respondent wrote Perry that respondent had collected $1,600 from Boyd and had placed the cash in his "cash receipts box." Respondent deposited subsequent rent payments into his personal account. Between May 22, 1987, and August 15, 1987, respondent collected $2,800 from Boyd. None of those funds were deposited in his trust account, nor did he open a separate trust account as he had promised Perry. Respondent made only one payment of $500 to Perry, in December 1987.

That respondent used $2,300 of the rent payments for his own purposes is undisputed. The DRB summarizes respondent's explanation for those rental payments as follows:

Respondent explained that he used the monies because he was in "financial trouble," but contended that he had Perry's consent thereto. Respondent testified that, between the time he prepared the agreement, May 1987, and the time Perry returned it to him, August 1987, they reached an understanding for respondent's use of the rent payments as a loan. According to respondent,

> [Perry] knew that I was in a bind. I had told him about the levies and everything. He was aware of those and he agreed that I could make myself a loan from the monies that I collected provided I paid it back.

When he was asked about the absence of any writings memorializing this understanding, respondent explained that the agreement was "basically under the table," i.e., "[i]t wasn't supposed to last that long. I did it as a friend. I was supposed to replace the money within a short amount of time."

OAE Chief Auditor Gerald Smith testified that when he first called Perry, Perry informed Smith that he had made numerous requests that respondent turn over the collected rent payments. Perry eventually engaged an attorney who wrote respondent on September 11, 1987, requesting that he immediately forward the rent-collection monies. Respondent replied that he would prepare an accounting and send the money in thirty days. However, respondent never provided an accounting and remitted only $500. Finally, in February 1988 Perry obtained a default judgment against respondent for $2,250 plus costs, which Perry never collected. In March 1989 Perry won two million dollars from the New Jersey lottery and forgave respondent's debt.

Perry's testimony before the DEC, however, was vague concerning whether he had consented to respondent's use of the money. As the DRB decision noted, he testified as follows:

A. [M]aybe he said something to me about using my money because I don't know. I was trying to think it up and just maybe I did say it * * *. Maybe I did say he could use the money.

 * * * * * * * *

Q. When was he going to pay you back?

A. He said he was going to work it off like doing this, doing that. I guess I got a couple bills [sic] from him. I just thought nothing was ever going to come of this so I threw the stuff away.

Q. How long when you had this conversation with him when you said you were outside of the Elks [Club] the summer of '87 was there a time limit put on when he was going to pay you back what funds he used?

A. No, I don't know. I don't think so.

Q. Was there a limit to the amount of money that he collected? Could he use any of the money he collected or did you put a limit on it?

A. I didn't put no limit [sic]. I didn't say, I don't remember saying that. It is out there, you know.

Q. Do you know how much money you were going to loan him?

A. Doesn't make that much difference at that time.

 * * * * * * * *

Q. Well, what made you change your mind because you went to [an attorney] to get this money back pretty shortly after?

A. Because I wanted the money for this piece of property. I was talking about trying to make a down payment on it. You know how it is maybe I just got angry.

Q. Why would you have gotten angry?

A. Sit down and brew, sometime mistakes you make with the mistakes you make [sic].

Perry explained further that he retained counsel because he was unable to reach respondent and because his wife, Mrs. Perry, was angry over respondent's use of the monies.

Q. Let me ask you a question seriously. We are trying to find out what happened here. This man says, Mr. Rogers says that you essentially gave him permission to use your money. That's what he is saying. When you call it an agreement contract that's what I say, that you told him, he says you said that around the time that he got the money or thereabouts May or June of 1987 it is really important for us to find out what happened here. My question to you is whether or not that's true and I think you've tried to tell us that in your own way and you're ashamed to tell us that. My question is did you get in trouble with your wife over this?

A. Yes, she always hollers at me.

Q. Is that why you went to [an attorney]?

A. Well, I had to then.

Q. Why did you have to go to [an attorney]?

A. Because she was complaining about the money.

 * * * * * * * *

[The DEC] concluded that respondent's conduct had violated RPC 8.4(c), "in that he misrepresented to Mr. Perry the receipt of the rent monies and their disposition. He fraudulently converted those monies to his own use." [The DEC] found further that respondent had violated RPC 1.15(a), by not keeping a client ledger card showing "receipt of the rent collection monies."

The DRB, however, concluded that Perry's testimony failed to demonstrate that respondent's use of the funds had been unauthorized. As the DRB stated:

To say that Perry's testimony was equivocal is an understatement: respondent "might have said something" about using the monies; "maybe" Perry did say

that respondent could use the monies; "probably" there was a verbal agreement for respondent's use of the monies, and so on.

Counts four and five alleged additional improprieties in respondent's dealings with Perry. Count four of the complaint charged respondent with tampering with Perry by inducing the witness to sign a certification stating that he had made a loan agreement with respondent. Respondent prepared the certification, which Perry signed either at respondent's law office or at the nearby Elks Club. However, Perry acknowledged that before signing the statement he had read and reviewed it with respondent and "couldn't see that much wrong with it." We agree with both the DEC and the DRB that the evidence does not clearly and convincingly show that respondent had induced or assisted Perry to testify falsely.

Count five of the complaint alleges that respondent created a conflict of interest situation by entering into a business transaction with Perry (the loan agreement) without disclosing to him the full circumstances of the representation or advising him to secure independent counsel.

Although the DEC found that respondent should have informed Perry of potential conflicts and advised him to seek independent advice, the DRB concluded that the evidence did not clearly and convincingly prove that respondent's failure to have Perry seek independent counsel was unethical. As the DRB aptly described the situation:

> Because of the special relationship between the parties, respondent's failure to advise Perry to seek the advice of independent counsel cannot be deemed unethical. The record is clear that respondent's and Perry's understanding about the use of the monies could not be characterized as a business deal between lawyer and client but, rather, an accommodation or a favor between close friends who also regarded themselves as cousins.

### III

■ Generally, a lawyer found guilty of misappropriation will be disbarred in order to preserve the public's confidence in the bar. *In re Wilson*, 81 *N.J.* 451, 453, 409 *A.*2d 1153 (1979). The disbarment rule is invoked, however, only when the record

clearly and convincingly demonstrates that a lawyer has *knowingly* misappropriated a client's funds. *In re Noonan*, 102 *N.J.* 157, 160–61, 506 *A.*2d 722 (1986). Knowing misappropriation "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." *Id.* at 160, 506 *A.*2d 722. In *In re Hollendonner*, 102 *N.J.* 21, 504 *A.*2d 1174 (1985), we clarified that misuse of escrow funds triggers the disbarment rule. *Id.* at 28–29, 504 *A.*2d 1174.

■ We are unable to conclude from this record that the totality of circumstances demonstrates clearly and convincingly that respondent knowingly misappropriated the real-estate escrow funds held in the Hull–Homer transaction.

Respondent's problems arose out of unique circumstances. His actions with respect to the entire escrow fund of $69,195.26 were proper. Through no fault of his own, American Express improperly levied on his client trust account. As a consequence, the trust account check he wrote to pay off the Yagoda mortgage bounced. He immediately called Yagoda, explained the problem, sent him a check for $25,789.31, and promised to pay him the balance due of $3,500 as soon as his financial difficulties were resolved. Yagoda agreed to those terms and granted respondent a temporary reprive from the mortgage debt.

Respondent claims that he and Yagoda had agreed that respondent would be personally responsible for repaying the mortgage. Hence, although respondent realized that he still owed Yagoda $3,500, he believed that the American Express check represented his own funds, albeit to be used to pay the mortgage, and not escrow funds.

Yagoda testified that he did not perceive that the numerous extensions of time he granted respondent as converted the money returned by American Express from escrow funds into respondent's funds, subject only to respondent's personal obligation to discharge the mortgage. However, that respondent's

understanding of the transaction was unreasonable is not clear. Respondent's actions corroborate his asserted belief that his promise to pay superseded his obligation to pay the mortgage out of the escrow funds. Respondent did make mortgage payments totalling $2,500 between July and August 1987. Respondent returned to Yagoda the mortgage that Yagoda had previously sent him for cancellation. Yagoda also testified that respondent had been willing to sign a loan document for him.

Q. At any time did you ask Mr. Rogers to sign a debt instrument such as a note or a bond and/or mortgage in connection with this obligation?

A. No, I think Mr. Rogers may have indicated that he would sign something to that effect.

Q. I mean you are in the mortgage business and I assume that you have access to forms for notes, mortgages and things like that. I am asking you whether or not you ever asked him to sign something like that?

A. The answer I gave you is the one that stands.

Q. What is that answer?

A. Mr. Rogers volunteered to sign something.

Q. What did you say?

A. I agreed as long as it was short term, very short term.

Q. Did you ever—did he send you something?

A. He may have, I don't recall to be honest with you.

We recognize the import of respondent's dire financial situation and of the inconsistencies between his statement to Chief Auditor Smith and his testimony before the DEC. Nonetheless, we are unable to conclude that under the totality of circumstances the record clearly and convincingly demonstrates that respondent knowingly misappropriated the escrow funds. The evidence indicates that respondent may have had a good faith belief that the character of the returned American Express check had been converted from "escrow funds" to his own funds, subject of course to his debt to Yagoda. Although respondent's belief was incorrect, we cannot conclude from this record that his misappropriation was "knowing."

 Nevertheless, respondent's conduct towards his clients the Hulls was highly unethical and deserving of discipline. As explained by the DRB decision, the three members of the DRB

who voted against disbarment recommended a two-year suspension for the following reasons:

> In their opinion, the two-year suspension is justified by respondent's serious acts of misconduct, which posed substantial risks and caused financial detriment to his clients—the Hulls—and to the parties who had reason to rely on him as escrow agent. Those included the Homers, who entrusted respondent with funds specifically designated for the satisfaction of the mortgage, who remained obligated thereunder, and who were subsequently sued by Yagoda as respondent's co-defendants; the title company, trusting that it was insuring clear title; and the bank that financed the Hulls' purchase, relying on the reasonable premise that it was holding a first mortgage on the property.

We agree that respondent's misconduct with respect to the Hulls was extremely serious. He failed to advise them that the mortgage on the Homer property had not been discharged. The Hulls had to delay the Stockhamer closing to secure the funds to pay off the Yagoda lien. Additionally, at the time the DRB filed its Decision and Recommendation, respondent still owed the Hulls at least $1,600, having paid only $400 of his outstanding debt to them.

## IV

■ With respect to the Perry charges, we agree substantially with the DRB's recommendations. Counts four and five should be dismissed because the evidence does not clearly and convincingly show that respondent induced Perry to testify falsely or that respondent created a conflict of interest by entering into a business transaction with Perry without full disclosure of all relevant facts.

■ The DRB also found insufficient evidence to support the charge that respondent had knowingly misappropriated the rents he had collected for Perry. That is a very close call. Perry did sue respondent to recover those rent payments. On balance, however, considering respondent's special relationship with Perry and Perry's vague and contradictory testimony, we agree with the DRB that the evidence does not clearly and convincingly show that respondent knowingly misappropriated Perry's funds.

Nonetheless, his conduct with regard to Perry was extremely unethical. He did not promptly forward the collected rents to Perry. He forced his client to sue him to receive monies that were his.

Indeed, with regard to both the Hulls and Perry, respondent woefully failed to keep them reasonably informed of relevant information. He failed to disclose to the Hulls that the Yagoda mortgage was not paid off; failed to abide by his agreement with Perry to provide Perry with an accounting of the rent he collected; failed to keep his trust account properly with respect to both the Perry and Hull transactions; failed to properly designate his trust account; failed to maintain an attorney business account; failed to keep a client ledger card; failed to keep the Perry rents in a separate bank account; and failed to notify his client on receipt of the funds, all in violation of *RPC* 1.15(a), (b), and (d).

V

Although we conclude that respondent did not knowingly misappropriate either the escrow funds held in the Hull–Homer transaction or the Perry rent, we find that respondent is guilty of serious ethical infractions. In considering the appropriate discipline, we are mindful that respondent currently serves as an attorney in the Office of the Public Defender.

Respondent's actions are comparable to other cases in which we were convinced that an attorney had handled his client's funds unethically but there was insufficient evidence to establish a knowing misappropriation. In *In re Chidiac*, 120 *N.J.* 32, 575 *A.*2d 1355 (1990), an attorney failed to keep any records on his management of his client's property and did not deposit the rents from that property into an attorney trust account. Despite his good faith belief that use of the funds was authorized, we held that his serious misconduct warranted severe discipline, and imposed a three-year suspension. *Id.* at 38–39, 575 *A.*2d 1355. In *In re Perez*, 104 *N.J.* 316, 517 *A.*2d 123 (1986), an

attorney clearly misused his client's escrow funds. There, as in this case, we could not "conclude that the record demonstrate[d] clearly and convincingly that [Perez's client] *did not* consent to respondent's use of escrow funds," *id.* at 324, 517 *A.*2d 123, and so were unable to find a knowing misappropriation justifying disbarment. *Id.* at 325, 517 *A.*2d 123.

Given the gravity of respondent's improprieties, we order that he be suspended from the practice of law for a period of two years.

Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs, including the costs of transcripts.

So ordered.

*For suspension*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN—7.

*Opposed*—none.

## ORDER

It is ORDERED that LEE JASPER ROGERS of RED BANK, who was admitted to the bar of this State in 1981, is hereby suspended for two years, effective January 1, 1992, and until the further Order of the Court; and it is further

ORDERED that respondent shall be restrained and enjoined from practicing law during the period of his suspension and that he shall comply with Administrative Guideline 23 of the Office of Attorney Ethics, which governs suspended attorneys; and it is further

ORDERED that respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs incurred in the prosecution of this matter.