793 A.2d 699

IN THE MATTER OF JACK N. FROST, AN ATTORNEY AT LAW.

Argued January 15, 2002—Decided April 5, 2002.

*Brian D. Gillet,* Deputy Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Frank P. Sahaj,* argued the cause for respondent (*Younghans, Burke & Sahaj,* attorneys).

The opinion of the Court was delivered by

ZAZZALI, J.

In October 1996, a Judge of Workers' Compensation contacted the Office of Attorney Ethics (OAE) when testimony at a hearing before him suggested that respondent, Jack N. Frost, may have misused client funds. The OAE subsequently conducted a demand audit of respondent's books and records. Shortly thereafter, the OAE filed a complaint against respondent alleging violations of the Rules of Professional Conduct (RPC), including RPC 1.8(a), conflict of interest/prohibited business transaction with a client; RPC 1.15(a), knowing misappropriation of escrow funds and failure to safeguard the funds of a third party; and RPC 8.4(c), conduct involving dishonesty, fraud, deceit or misrepresentation. The OAE later added the charge of failing to cooperate, in violation of RPC 8.3.

Special Master Miles S. Winder, III, issued a presentment finding respondent guilty of negligent misappropriation rather than knowing misappropriation. The Special Master also found respondent guilty of the remaining charges in the complaint, except for the charge that respondent failed to cooperate with the OAE, noting that the "disorganized and disjointed responses made by [respondent] were very close to non-cooperation." The Special Master recommended that respondent receive a one-year suspension consecutive to the two-year suspension that respondent was then currently serving. Respondent's two-year suspension expired in November 2001. As of the date of oral argument, respondent had not yet applied for reinstatement.

Upon a *de novo* review of the record, the Disciplinary Review Board (DRB) concluded that the Special Master's determination was fully supported by clear and convincing evidence in the record. Six members of the DRB voted for a one-year suspension and two public members voted for disbarment. Our independent review of the record leads us to conclude that respondent should be disbarred.

I

Respondent was admitted to the New Jersey bar in 1971 and has an extensive ethics history. In 1988, he received two private reprimands for a conflict of interest in a criminal matter and for failing to safeguard client funds in a separate matter. Respondent was again privately reprimanded in 1992 for endorsing a client's name on a settlement check without the client's authorization.

On November 18, 1997, respondent was suspended for three months for five separate instances of misconduct, including charging an unreasonable fee, conflict of interest, asserting a frivolous claim, lack of candor toward a tribunal, failure to act with fairness to an opposing party and counsel, untruthfulness in statements to others, assisting in the unauthorized practice of law, conduct involving dishonesty, fraud, deceit or misrepresentation, failure to expedite litigation, and conduct prejudicial to the administration of

justice. *In re Frost,* 152 *N.J.* 25, 25–26, 702 *A.*2d 476 (1997). On the same day, the Court imposed a six-month suspension, consecutive to the three-month suspension, for gross neglect and lack of diligence in three matters, failure to communicate in two matters, and a pattern of neglect. *In re Frost,* 152 *N.J.* 23, 23–24, 702 *A.*2d 475 (1997).

In November 1998, respondent received a two-year suspension for failure to safeguard escrow funds and conduct involving dishonesty, fraud, deceit or misrepresentation. *In re Frost,* 156 *N.J.* 416, 416, 719 *A.*2d 1018 (1998). Specifically, respondent breached an escrow agreement, failed to honor mortgage closing instructions, and prepared misleading closing documents. *Id.* at 416–17, 719 *A.*2d 1018.

## II

The present matter was initiated when the Honorable Lawrence G. Moncher, J.W.C., informed the OAE that he had presided over a workers' compensation matter in which respondent had represented the petitioner, Bruce Hagerman. According to Judge Moncher, testimony presented during hearings before him revealed that respondent may have mishandled client funds. Consequently, in November 1996, the OAE notified respondent that a demand audit would be conducted in December 1996.

In July 1998, the OAE filed the instant complaint against respondent. Shortly thereafter, this Court appointed Special Master Winder to hear the matter. After a prehearing conference, respondent moved to disqualify Special Master Winder on the ground that he had heard prior ethics complaints against respondent. The motion was denied and the DRB rejected respondent's appeal. The Special Master conducted a hearing in September and October of 1999.

The following facts were adduced at the hearing. In February 1988, Bruce Hagerman (Hagerman), a commercial roofer employed by E.R. Barrett Roofing Company, suffered serious injuries when he fell off the roof of a five-story building while

operating an air broom manufactured by Aeroil Products Company, Inc. (Aeroil). Hagerman subsequently hired Michael Rubino (Rubino) to represent him in litigation relating to the accident. In the past, Rubino had referred several matters to respondent. A few weeks later, Rubino recommended that respondent handle the case and, in March 1988, respondent became co-counsel representing Hagerman. On behalf of Hagerman, respondent filed a workers' compensation claim petition and a third-party products liability action against Aeroil.

In October 1990, respondent and Rubino settled with Aeroil for $500,000, consisting of a $400,000 cash payment and a $100,000 annuity. Respondent deposited the check in his attorney trust account on November 19, 1990. Four days later, respondent made a disbursement to Hagerman. Two days after that, he made a disbursement to himself and Rubino.

Prior to the Aeroil settlement, Rubino attempted to negotiate a compromise with CNA Insurance Companies (CNA) in respect of the workers' compensation lien that existed as a result of the payment of Hagerman's workers' compensation claim by his employer. Based on those discussions, Rubino testified that he believed he had compromised CNA's lien to $79,000, and also had agreed to a one-third reduction of future medical payments for Hagerman. Rubino sent a letter to CNA confirming his understanding. By letter dated December 3, 1990, respondent sent CNA a trust account check in the amount of $79,000. However, CNA refused to accept the check, denied that it had compromised its lien, and notified Rubino that it was returning the unnegotiated check to respondent.[1] Respondent testified that he believed that he had "tendered the funds" to CNA and that CNA had rejected the tender. According to respondent, because he believed that the funds legally belonged to Hagerman, he transferred the funds

---

[1] According to respondent, CNA sent a cover letter with the returned check and the letter did not assert a claim for more money. However, neither party presented a copy of this letter and, as noted by the Special Master, there was speculation that no such cover letter existed.

from his trust account to his escrow account under Hagerman's name.

During an appointment with Hagerman in early October of 1991 to discuss the results of respondent's research on CNA's lien, respondent approached Hagerman about a loan. According to respondent, he advised Hagerman "to seek independent counsel" and that he "would not do the deal unless [Hagerman] sought independent counsel." Respondent stated that Hagerman replied that he wanted to think about the loan. Hagerman subsequently contacted Rubino and Rubino advised him against lending the funds to respondent. Hagerman then contacted respondent and refused to loan him the funds.

According to Hagerman, respondent contacted him approximately two weeks later concerning the possible loan. Respondent told Hagerman that the escrow account provided a very low interest rate and that he would pay a rate of fifteen percent interest on a loan. Respondent allegedly informed Hagerman that although he was legally entitled to the funds he would be required eventually to pay CNA $79,000. Hagerman denies that respondent so advised him. In any event, Hagerman agreed to the loan. Respondent used a power of attorney form document to draft the loan agreement. The agreement contained the following additional terms:

a. As of October 17, 1991, $80,636.89 was to be held in escrow;

b. Hagerman agreed to lend $79,000 to respondent at an annual interest rate of fifteen percent;

c. Respondent was to pay Hagerman $987.50 per month until full payment of the principal, with a lesser amount as the principal was paid down;

d. Respondent could make full or partial payments without penalty;

e. All payments of principal were to be deposited in a special escrow account;

f. Respondent was to pay the full $79,000 within ninety days if CNA demanded payment;

g. If respondent defaulted on the loan, he would hold Hagerman harmless and indemnify Hagerman for all expenses and attorneys' fees incurred by Hagerman;

h. *Respondent represented that he owned six acres of unencumbered land worth between $150,000 and $200,000 and an unencumbered one-half interest in a*

*house in North Carolina; if so requested, respondent would give Hagerman a first mortgage on those properties;*

i. Respondent represented that his law firm's assets were worth more than $2,500,000, after payment of all debts.

(Emphasis added).

Although respondent represented that his six acres were unencumbered, respondent's interest in that parcel had been purchased by respondent's wife in July 1985, with respondent acting as his wife's counsel. The deed, which respondent prepared, did not list his name.

In October 1991, respondent transferred $80,636.89 from the Hagerman sub-account to his principal escrow account and issued three escrow account checks to Hagerman. Hagerman endorsed two of the checks to respondent, one for $39,000 and the other for $40,000. Hagerman negotiated the third check, in the amount of $1,636.89, for "interest earned on account." It is undisputed that the $40,000 check was deposited in respondent's attorney business account, and that respondent used the funds for law firm expenses. It is unclear what happened to the $39,000 check. Respondent initially told the OAE that he deposited $22,000 in his payroll account and put the $17,000 balance into his "pocket." However, at the ethics hearing, respondent testified that the $39,000 check was deposited in his wife's checking account. In any event, respondent did not deposit the $39,000 check in either his trust or his business account. Respondent did not have a personal checking account and used his attorney business account as his personal checking account.

In November 1991, respondent and CNA settled the lien dispute. CNA prepared a settlement agreement whereby respondent would pay CNA $83,740 by April 24, 1992. If payment was not received by that date, respondent "individually and on behalf of [Hagerman]" would be required to pay CNA reasonable attorneys' fees and costs incurred to enforce the agreement. However, respondent did not sign the settlement agreement and failed to make any payments to CNA. He testified that he did not sign the

agreement because it did not comport with the terms he had negotiated with CNA.

In June 1992, CNA filed a civil action [2] against Hagerman, respondent, Rubino, Rubino's law firm, and Aeroil's insurer for payment of its workers' compensation lien. At a hearing on an Order to Show Cause, respondent advised the court of the loan from Hagerman. In August, respondent offered to settle the CNA action by paying CNA $95,000. In correspondence, respondent stated that the Hagerman loan was secured by fees from a separate case and that the borrowed "money was disbursed to pay the bills of the Law Firm." Apparently, CNA rejected the offer.

In October 1992, respondent filed for Chapter 11 bankruptcy, resulting in a stay of his participation in the CNA action. In December 1995, Hagerman and Rubino entered into a settlement agreement with CNA, pursuant to which Hagerman paid $10,000 in February 1996 as part of the settlement. Respondent represented to the bankruptcy court that he would pay Hagerman's $10,000 share of the CNA settlement, as well as Hagerman's attorneys' fees, allegedly from the interest on the $79,000 loan. However, as of the date of the Special Master's report, CNA had not been paid the $79,000. Finally, Hagerman's workers' compensation case, which apparently had been delayed by the CNA action, was settled in 1996.

At the conclusion of the hearing, Special Master Winder found that respondent was guilty of negligent, rather than knowing, misappropriation, that respondent failed to safeguard funds belonging to CNA, and that he engaged in a course of conduct that was dishonest and deceitful because he never had any intention of providing security for the loan and misrepresented the extent of his assets. In respect of the loan agreement, the Special Master concluded that the transaction was not at arm's length and constituted a prohibited business transaction with a client. He recom-

[2] The complaint actually was filed by Continental Insurance Company, which had been acquired by CNA, and which will be referred to herein as CNA.

mended that respondent be suspended for one year consecutive to his 1998 two-year suspension.

The DRB agreed with the Special Master's findings and recommendation, concluding that respondent effectively borrowed the money from Hagerman after first releasing the funds, although temporarily, to Hagerman, a party-in-interest. The DRB agreed that respondent owed a fiduciary duty to CNA arising out of the lien negotiations between CNA and Rubino. Despite the law of tender, respondent breached that duty because he never obtained CNA's consent to disburse the $79,000, in violation of RPC 1.15(a). The DRB further determined that respondent engaged in a prohibited business transaction and in conduct that was dishonest and deceitful when he entered into a contract that was patently unfair and unreasonable to his client, misrepresented the extent of his interests in certain assets, and never intended to provide security for the loan.

However, the DRB declined to impose disbarment, observing that respondent was guilty of negligent, and not knowing, misappropriation, and that the present matter pre-dated most of respondent's extensive ethics history. The DRB noted that if the present matter had been addressed simultaneously with the prior matter for which respondent had received a two-year suspension, respondent would have simply received a three-year suspension. Thus, the DRB recommended that respondent be suspended for one year to run consecutive to that two-year suspension. Two public members of the DRB voted to impose disbarment. The OAE subsequently filed a petition for review and respondent filed a cross-petition.

## III

### A. Conflict of Interest/Prohibited Business Transaction with a Client in Violation of RPC 1.8(a)

The Special Master and the DRB concluded that respondent's loan transaction with his client constituted a conflict of interest

and a prohibited business transaction in violation of RPC 1.8(a). We agree.

RPC 1.8(a) prohibits an attorney from entering into a business transaction with a client unless, among other things, the transaction and the terms are fair and reasonable to the client. Indeed, "[a] lawyer is required to maintain the highest professional and ethical standards in his [or her] dealings with his [or her] clients." *In re Smyzer*, 108 *N.J.* 47, 57, 527 *A.*2d 857 (1987) (citing *In re Gavel*, 22 *N.J.* 248, 262, 125 *A.*2d 696 (1956)). Furthermore,

all transactions of an attorney with his [or her] client are subject to close scrutiny and the burden of establishing fairness and equity of the transaction rests upon the attorney. . . . If the burden is not satisfied, equity has regarded such transactions tainted so as to constitute a constructive fraud. . . .

[*In re Gallop*, 85 *N.J.* 317, 322, 426 *A.*2d 509 (1981) (citations omitted).]

In *In re Wolk*, 82 *N.J.* 326, 327, 413 *A.*2d 317 (1980), the Court disbarred an attorney who misled a client by counseling her to invest in a building in which the attorney had an interest. In so holding, the Court admonished that it "will no more tolerate the hoodwinking of helpless clients out of funds in a business venture that is essentially for the benefit of the lawyer than it will outright misappropriation of trust funds." *Id.* at 335, 413 *A.*2d 317 (citing *In re Wilson*, 81 *N.J.* 451, 409 *A.*2d 1153 (1979)). Similarly, in *Smyzer, supra,* 108 *N.J.* at 49, 527 *A.*2d 857, the Court disbarred an attorney who entered into fraudulent and deceptive business transactions with clients, failed to protect their investments, failed to fully explain investments to the clients, and failed to disclose his interests in the companies. The Court found that the attorney had "deceived his clients in order to protect his investment in a company whose financial condition was rapidly deteriorating." *Id.* at 57, 527 *A.*2d 857. The Court also was troubled by the lack of independent consultation concerning those investments. In that respect, the Court cautioned that "a passing suggestion that the client consult a second attorney [will not] discharge the lawyer's duty when he [or she] and his [or her] client have differing interests." *Id.* at 55, 527 *A.*2d 857. Thus, "a lawyer must take every possible precaution in ensuring that his [or her] client is

fully aware of the risks inherent in the proposed transaction and of the need for independent and objective advice." *Ibid.*

In the present case, respondent participated in a business transaction with his client without the appropriate safeguards and without disclosing a conflict of interest. Respondent drafted the loan agreement and all of its terms, made misrepresentations in respect of the alleged collateral to induce his client to participate in the transaction, and did not perform title or lien searches or prepare security agreements in respect of the property. Although the agreement stated that respondent owned two properties and that respondent's law firm was worth in excess of $2,500,000, respondent did not give his client a security interest in those assets and did not provide his client with documentation of those assets. Indeed, respondent did not own the six acres of land identified as unencumbered in the loan agreement he prepared. As stated by the Special Master,

> there was no discussion of payment of more than the compromise amount to the worker's [sic] compensation carrier ... no discussion of what would happen if [respondent] went bankrupt. Simply put, there was no discussion of the financial issues that affected Hagerman because the lawyer in the transaction was acting in dual capacities as both lawyer and business partner.

Respondent's subsequent failure to repay Hagerman and CNA, even after CNA filed suit seeking payment of its lien, highlights the worthlessness of the loan agreement. In sum, respondent took advantage of an unsophisticated client whose trust he gained through the attorney-client relationship.

### B. *Conduct Involving Dishonesty, Fraud, Deceit or Misrepresentation in Violation of RPC 8.4(c)*

Both the Special Master and the DRB concluded that respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation when he entered into a loan agreement with his client that was patently unfair and unreasonable to his client, misrepresented the extent of his interests in certain assets, and never intended to provide security for the loan. We agree.

RPC 8.4(c) provides that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation. In the present case, respondent violated that rule when he misrepresented in the loan agreement that he owned land worth at least $150,000. Respondent's testimony that he had forgotten that his wife owned the property is at best disingenuous. The record indicates that prior to the instant matter respondent and his wife planned to protect their assets by putting them in respondent's wife's name. In fact, respondent had deeded his interest in their residence to his wife before 1991.

C. *Knowing Misappropriation of Client Funds in Violation of RPC 1.15(a)*

Both the Special Master and the DRB concluded that respondent committed negligent, rather than knowing, misappropriation. We disagree.

RPC 1.15(a) requires that a lawyer "hold property of clients or third persons that is in [his or her] possession in connection with a representation separate from the lawyer's own property" and that the property so held be "appropriately safeguarded." Misappropriation is "any unauthorized use by the lawyer of clients' funds entrusted to him [or her], including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he [or she] derives any personal gain or benefit therefrom." *In re Wilson,* 81 *N.J.* 451, 455 n. 1, 409 *A.*2d 1153 (1979). Knowing misappropriation "consists simply of a lawyer taking a client's money entrusted to him [or her], knowing that it is the client's money and knowing that the client has not authorized the taking." *In re Noonan,* 102 *N.J.* 157, 160, 506 *A.*2d 722 (1986). Thus, the attorney's state of mind or motives are largely irrelevant. Although in the present case respondent's client authorized the withdrawal of the funds, the consent of the third party, CNA, also was required, as will be discussed below.

In *In re Howard,* 121 *N.J.* 173, 578 *A.*2d 1219 (1990), an attorney received a settlement payment on behalf of his client and

promptly deducted his fees and costs. The attorney was to hold in trust $11,000 "to cover the estimated amount due on a workers' compensation lien" owed to the insurance company. *Id.* at 175, 578 *A.*2d 1219. However, the attorney eventually depleted the trust account to "$4,600 or $6,400 less than the $11,000 [the attorney] had agreed to hold in trust to pay the compensation lien." *Ibid.* Sixteen months after the settlement, the attorney paid the lien, which had been compromised to $11,707.67. *Ibid.*

The Court concluded that the attorney's actions constituted knowing misappropriation of client funds. *Id.* at 177, 578 *A.*2d 1219. According to the Court,

> during this sixteen-month period, [the attorney] did not maintain in his trust fund sufficient funds to pay [the insurer's] lien. All the parties in the [ ] case agreed that [the attorney] would pay [the insurer's] lien from the settlement proceeds deposited in his trust account. Hence, with respect to the lien [the attorney] acted as the depository of funds. His actions were akin to those of escrow agent. [In] *In re Hollendonner,* ... we held that 'an attorney found to have knowingly misused escrow funds will confront the disbarment rule of *In re Wilson* ....' Accordingly, we conclude that respondent knowingly invaded funds that were to be used to pay [the insurer's] compensation lien. Such action constitutes a knowing misappropriation of funds under *In re Wilson* ....
>
> [*Id.* at 178, 578 *A.*2d 1219 (citations omitted).]

In *In re Hollendonner,* 102 *N.J.* 21, 22, 504 *A.*2d 1174 (1985), an attorney was charged with misappropriation of escrow funds and improper record keeping. Although he obtained the consent of his client to withdraw the escrow funds, he failed to obtain the consent of the third party. *Id.* at 28–29, 504 *A.*2d 1174. The Court noted that "it is a matter of elementary law that when two parties to a transaction select the attorney of one of them to act as the depository of funds relevant to that transaction, the attorney receives the deposit as the agent or trustee for both parties." *Id.* at 28, 504 *A.*2d 1174 (citing *Mantel v. Landau,* 134 *N.J.Eq.* 194, 195, 34 *A.*2d 638 (Ch.1943), *aff'd,* 135 *N.J.Eq.* 456, 39 *A.*2d 88 (E. & A.1944)). The Court further explained that

> [t]he parallel between escrow funds and client trust funds is obvious. So akin is the one to the other that henceforth an attorney found to have knowingly misused escrow funds will confront the disbarment rule of *In re Wilson* ....
>
> [*Id.* at 28–29, 504 *A.*2d 1174 (citation omitted).]

However, the Court declined to apply the rule of automatic disbarment retroactively given "the absence of clear and convincing evidence that [the attorney] invaded the escrow funds with knowledge that the use of those funds was improper" and in view of the fact that the case presented the first occasion that the Court addressed the "near identity of escrow funds and trust funds." *Id.* at 29, 504 *A*.2d 1174. Instead, the Court imposed a one-year suspension. *Ibid.*

█ This record presents clear and convincing evidence that respondent knowingly misappropriated funds belonging to CNA. Respondent came into possession of CNA's funds as a result of the settlement of a third-party lawsuit. Shortly after receiving the settlement proceeds, respondent forwarded a check for $79,000 to CNA in an effort to satisfy CNA's workers' compensation lien pursuant to *N.J.S.A.* 34:15–40. That respondent was aware of the existence and the amount of CNA's lien is undisputed. That respondent sent the check to CNA in satisfaction of the lien evidences his awareness that the funds did not belong to him or his client. Thus, when CNA returned the check to respondent, respondent had a duty to safeguard the funds and deposit them in his escrow account. Regardless of who was the rightful owner of the funds at that time, respondent was an escrow agent and was well aware that the money was not his property.

The fact that Hagerman consented to the use of the funds is irrelevant. As noted in *In re DiLieto*, 142 *N.J.* 492, 665 *A*.2d 1094 (1995),

[a]n attorney cannot satisfy his or her professional responsibility with respect to escrow funds by simply relying on information from a client. . . . 'It is not enough simply to follow a client's instructions.'

[*Id.* at 506–07, 665 *A*.2d 1094 (quoting *In re Wallace*, 104 *N.J.* 589, 593, 518 *A*.2d 740 (1986)).]

As escrow agent, respondent required the consent of both parties to use the funds for his benefit. *In re Gifis*, 156 *N.J.* 323, 359–60, 717 *A*.2d 406 (1998). However, respondent entered into the loan agreement with Hagerman, for his own benefit, without first

obtaining the permission of CNA and knowing that CNA still was owed at least $79,000.

We agree with the Special Master and the DRB that respondent's "tender" argument does not exonerate respondent. Respondent contends that he is not guilty of knowing misappropriation because the law of tender applies and therefore he had no obligation to hold the funds in escrow. Neither the case law relied upon by respondent nor the common law concept of tender supports respondent's position. The common law concept of tender provides that if a creditor refuses to accept money tendered by a debtor title to the money reverts to the debtor. 74 *Am. Jur.2d Tender* §§ 33, 35 (2001). However, "legal tender is that kind of [payment] which the law compels the creditor to accept in payment of his debt when tendered by the debtor *in the right amount.*" *Black's Law Dictionary* 1467 (6th Edition 1990) (emphasis added). Here, CNA did not accept the $79,000 check tendered by respondent because CNA believed that it had not compromised its lien to $79,000. Thus, CNA rightfully rejected the payment. Furthermore, respondent cites no authority for the proposition that title or ownership of the funds passed from CNA to Hagerman, with respondent acting as escrow agent for Hagerman alone. CNA did not lose the benefit of the statutory lien simply by exercising its right to reject a check insufficient to satisfy the lien.

Respondent cites *In re Shelly*, 140 *N.J.* 501, 513, 659 *A.*2d 460 (1995), where we found that an attorney did not knowingly misappropriate funds based on the "unique facts" of the case, including the "long-standing and exceedingly informal nature of [the attorney's] professional relationship with [his client], especially concerning the payment of [the attorney's] fees." Such is not the case here. Respondent also cites *In re Rogers*, 126 *N.J.* 345, 599 *A.*2d 141 (1991), in support of his argument that he had a "reasonable or good faith basis" to believe that the money belonged to his client. However, in *In re Callaghan*, 162 *N.J.* 182, 182–83, 742 *A.*2d 558 (1999), this Court affirmed the DRB's

recommendation of disbarment for knowing misappropriation of client funds, rejecting the attorney's argument that he had a good faith belief that he was entitled to fees and had no intent to steal or borrow client funds. In recommending disbarment, the DRB commented that

> while [the attorney's] belief of entitlement, if reasonable, could save him from a finding of knowing misappropriation with respect to the disbursements as fees, that argument does not apply to the loans to himself.
>
> (Citations omitted).

It is undisputed that the $79,000 was a loan from Hagerman to respondent. The record does not indicate that respondent was entitled to fees from the $79,000.

In *Gifis, supra*, 156 *N.J.* at 323–24, 717 *A.*2d 406, the Court rejected a similar argument. While representing a seller in a real estate transaction, the attorney took a $51,000 deposit that he was holding in escrow with the consent of his client, but without the consent of the buyer. *Id.* at 328–29, 717 *A.*2d 406. He also used a $10,000 settlement that was to be held in escrow and a $6,500 deposit without the consent of either party. *Id.* at 331, 345, 717 *A.*2d 406. In concluding that the attorney was guilty of knowing misappropriation of client funds, the DRB rejected the attorney's argument that, based on his understanding of the transaction and the law, the funds belonged to his client. *Id.* at 362, 717 *A.*2d 406. The DRB noted that "such a mistake of law would not have exonerated [the attorney] from responsibility of knowing misuse of escrow funds." *Id.* at 352, 717 *A.*2d 406.

In *In re Barlow*, 140 *N.J.* 191, 192, 657 *A.*2d 1197 (1995), an attorney drew a check to himself knowing that the funds were intended to be used to pay unpaid invoices for title insurance and surveyors' fees on two separate closings. The attorney claimed that by drawing the check to himself and depositing the funds in his business account, he intended to pay those expenses from that account. *Id.* at 197, 657 *A.*2d 1197. However, he failed to pay the first invoice until three months later, and finally paid the last invoice nearly three years later. *Ibid.* The Court noted that at the time the funds were transferred to his business account, it was

short approximately $187.50. *Id.* at 197–98, 657 *A.*2d 1197. Instead of paying the expenses, the attorney issued checks to pay personal expenses. *Id.* at 198, 657 *A.*2d 1197. The Court rejected the attorney's contention that he had an honest belief that his actions did not constitute knowing misappropriation. *Id.* at 198–99, 657 *A.*2d 1197.

Like the attorneys in *Gifis* and *Barlow,* respondent is a long-time practitioner who has compromised "hundreds" of workers' compensation liens. His "tender" argument that he believed CNA's return of the check changed the character of the funds is simply unbelievable. Further, respondent misled Hagerman when respondent said that the $79,000 belonged to Hagerman alone. Clearly, respondent's belief that the funds were Hagerman's alone is not based on any verifiable facts and cannot excuse his failure to perform his ethical duties.

## IV

Based on respondent's present and past violations of the Rules of Professional Conduct, we conclude that the appropriate punishment is disbarment.

In the case of knowing misappropriation, disbarment is an appropriate penalty even if the lawyer did not possess the subjective intent to steal the money but only intended to borrow it. *In re Warhaftig,* 106 *N.J.* 529, 533, 524 *A.*2d 398 (1987). "[M]aintenance of public confidence in this Court and in the bar as a whole requires the strictest discipline in misappropriation cases. That confidence is so important that mitigating factors will rarely override the requirement of disbarment." *Wilson, supra,* 81 *N.J.* at 461, 409 *A.*2d 1153.

In *Smyzer, supra,* 108 *N.J.* at 48, 527 *A.*2d 857, the Court disbarred an attorney who entered into fraudulent and deceptive business transactions with clients, failed to protect their investments, failed to fully explain investments to them, and failed to

disclose his interests in the companies. In so holding, the Court warned:

> In view of the trust placed in an attorney by his [or her] clients and the attorney's often superior expertise in complicated financial matters, *a lawyer must take every possible precaution in ensuring that his [or her] client is fully aware of the risks inherent in the proposed transaction and of the need for independent and objective advice.*
>
> [*Id.* at 55, 527 *A.*2d 857 (emphasis added).]

Even if respondent committed negligent, rather than knowing, misappropriation, we would conclude that disbarment is the appropriate penalty. "[I]n the totality of the circumstances respondent has demonstrated that his ethical deficiencies are intractable and irremediable." *In re Templeton,* 99 *N.J.* 365, 376, 492 *A.*2d 1001 (1985). Respondent's extensive ethics history and his "profound lack of professional good character and fitness" compels the conclusion that respondent should not be allowed to practice law in New Jersey. *Ibid.*

Respondent's disciplinary history further supports our conclusion that disbarment is necessary. Respondent has received two private reprimands and three suspensions for thirteen separate instances of misconduct. Respondent consistently has demonstrated a disregard for the Rules of Professional Conduct, and "[w]e are unable to conclude that respondent will improve his conduct." *In re Cohen,* 120 *N.J.* 304, 308, 576 *A.*2d 855 (1990).

> [T]he totality of the evidence against respondent reveals a pattern of intentional deception and dishonesty that clearly and convincingly demonstrates 'that his ethical deficiencies are intractable and irremediable.' His conduct has destroyed 'totally any vestige of confidence that [he] could ever again practice in conformity with the standards of the profession.'
>
> [*DiLieto, supra,* 142 *N.J.* at 507, 665 *A.*2d 1094 (quoting *Templeton, supra,* 99 *N.J.* at 376, 492 *A.*2d 1001).]

The only way to protect the public and prevent a reoccurrence of respondent's behavior is by his disbarment.

 In the present matter, respondent participated in a conflict of interest transaction with his client without first securing the appropriate safeguards for his client or the third party. He made misrepresentations in respect of his finances, the true

ownership of his assets, and his financial position in order to induce his client to participate. It is axiomatic that

> [a]n attorney should refrain from engaging in a business transaction with a client who has not obtained independent legal advice on the matter. . . . [A]n attorney's judgment can be impaired by his [or her] self-interest. In such a situation, an attorney has a duty to explain carefully, clearly, and cogently why independent advice is needed.
>
> [*In re Doyle,* 146 *N.J.* 629, 643, 684 *A.*2d 1377 (1996) (citations omitted).]

Respondent was concerned only with his own self-interest—obtaining a loan from Hagerman. Respondent knew that Rubino, his co-counsel on the underlying case, had advised Hagerman against entering into the loan transaction. Respondent's failure to respect Hagerman's hesitancy in engaging in the transaction, and his subsequent overreaching in convincing his client to enter into a transaction fraught with risk, demonstrates unethical conduct in violation of the Rules of Professional Conduct. Respondent's conduct is even more egregious considering that funds were beginning to leave the account before Hagerman agreed to the loan.

This Court has "not hesitated to order disbarment where a lawyer uses his position to advance personal interests at the expense of clients." *In re Yaccarino,* 117 *N.J.* 175, 182, 564 *A.*2d 1184 (1989); *see also Smyzer, supra,* 108 *N.J.* at 48–49, 527 *A.*2d 857 (ordering disbarment where attorney misled clients into participating in business transaction in which he had interests); *In re Servance,* 102 *N.J.* 286, 286–87, 508 *A.*2d 178 (1986) (ordering disbarment where attorney misrepresented to clients that attorney had knowledge of nature and soundness of clients' investments); *Wolk, supra,* 82 *N.J.* at 327, 413 *A.*2d 317 (disbarring attorney who represented client in business matter in which attorney was personally involved). Considering respondent's conduct in this matter, including his conflict of interest, his deceit and fraud, and even assuming that the misappropriation was "only" negligent, disbarment is appropriate.

The DRB's observation that the present misconduct "predates most of the actions for which respondent has been disciplined," a

fact which may be relevant in other settings, is not relevant here. As noted, respondent's ethics history spanning the last fifteen years demonstrates an absolute disregard for his professional responsibility. His demonstrated contempt for his oath, on so many occasions, establishes that respondent is an unrepentant recidivist. He has had not one, but five opportunities to rehabilitate himself. Experience informs us that he is not entitled to, and the public should not have to endure, yet another opportunity for gross misconduct.

The ultimate goal of attorney discipline is to preserve the confidence of the public in the integrity and trustworthiness of lawyers. To that end, the discipline to be imposed must reflect the gravity of the misconduct in light of all relevant circumstances. *In re Nigohosian,* 88 *N.J.* 308, 315, 442 *A.*2d 1007 (1982). In order to maintain confidence in the integrity of the bar, we conclude that the appropriate penalty is disbarment. Respondent shall reimburse the Disciplinary Oversight Committee for appropriate costs.

So Ordered.

## ORDER

It is ORDERED that **JACK N. FROST** of **PLAINFIELD**, who was admitted to the bar of this State in 1971, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that **JACK N. FROST** be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that **JACK N. FROST** comply with *Rule* 1:20–20 dealing with disbarred attorneys; and it is further

ORDERED that **JACK N. FROST** reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

*For disbarring*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA, and ZAZZALI—7.

*Opposed*—None.